Davis, J.,
delivered the opinion of the court:
The brig Tally-ho, deep laden with coal, October 3,1883, bound for Boston from the southward, while passing’ near Nantucket shortly after 8 by the clock, post meridian,, came into collision with a steam vessel bound in the opposite direction. The brig sank and (with her cargo and her crew’s per *373 sonal property) became a total loss. The steamship was a vessel of the United States Navy, named the Pinta, and rated as “gunboat” of the fourth class.
The case of these plaintiffs was referred to this court (under the Bowman Act) by the Secretary of the Navy in 1884 (Department Case No. 16). It was, in due course, dismissed for lack of jurisdiction.
January 9, 1897, the following act was approved by the President:
uBe it enacted by the Senate and Souse of Representatives of the United States ot America in Congress assembled, That the claim of the legal owners of the brig Tally-ho, her cargo and freight, and of personal effects on board her, alleged to have been sunk by a collision with the United States steam vessel of war Pinta on or about the third day of October, eighteen hundred and eighty-three, be referred to the Court of Claims, to hear and determine the same to judgment, notwithstanding the lapse of time, with right of appeal as in other cases.
“ Whereas the legal owners of said brig, cargo, freight, and personal effects, or some of them, did, on the 29th day of July, eighteen hundred and eighty four, file in said Court of Claims, in the case referred to said court by the Secretary of the Navy, and then numbered on the docket of said court departmental case numbered sixteen, their petition setting forth their losses by said collision; and whereas evidence has been taken upon said petition, both by said petitioners and by the United States, and said evidence has been filed in said court, the claim above referred to said court may be heard and determined by said court upon said petition already filed therein; and the said evidence already taken and filed by either partyupon said petition may b.e used and referred to in said hearing and determination of said claim in all respects as if originally taken and filed for the purpose of the hearing and determination thereof provided for by this act, with the right of either party to appeal to the Supreme Court of the United States.”
The substantial contention here is upon the facts. They have been found and are set forth in-the findings. Thus there remains only the duty of applying to these facts the familiar rules of admiralty law.
The situation was this: Through a fairway, sufficiently broad, with strong tides, a deep-laden coasting brig was bound to the eastward with a nearly following wind. She was running free with main boom well off) foremast yards athwartships and yawing to some extent — a natural incident of that condition. The brig’s course was the usual one in that place. At the time *374 of tbe collision sbe bad passed Cross Eip ligbt-sbip and was beaded for Handkerchief Sboal ligbt-sbip, all in due course of ordinary coast pilotage. Just before tbe collision hereinafter mentioned sbe was steering about east-southeast, perhaps a trifle to tbe southward of tbe regular course, to allow for tide. Her side lamps were alight and there were sufficient lookouts and crew on deck, and alert.
At tbe same time Pinta was approaching in directly tbe opposite direction, steaming only some 4 knots an hour, as sbe was short of coal. Her lights were properly set. Each vessel was seen from tbe other in due time, but there was upon tbe part of Pinta some uncertainty as to the course of Tally-bo, which bad tbe right of way. Tbe two vessels approached “head on, Tally-ho, running free, necessarily “yawed, and tbe confusion on Pinta as to her lights was not unnatural. In fact so natural was it, so much to be expected was this confusion, that it should have been considered by Pinta as an important element in her own maneuvers.
Tally-ho, just before collision, had all sail set except main topsail and fore-topmast staysail — peak of mainsail dropped; she was running about 5 knots an hour. The night was overcast, bub the atmosphere was clear; there was no difficulty in seeing lights. Both vessels had sufficient watches on deck awake and alert.
From the brig Pinta s lights were seen about 1 point on brig’s starboard bow, distant about a mile. The brig was held steady on her course; here she complied with the regulations: collision not then impending, but she undoubtedly and unavoidably did yaw, thus creating confusion on the steam vessel.
Tally-ho (pursuing her course) was hailed from Pinta to “ hard a starboard. Tally-ho’s helm was then, put a-starboard obeying the hail; but this too late to avoid collision. The fact that the hail was understood shows the proximity of the two vessels. The Pinta’s engines were stopped just before collision, but they were not reversed until after collision; this because the bell wire from the bridge to the engine room broke.
There is thus presented the familiar case of a deep-laden collier staggering up channel, keeping within the strict rules of the road and her technical rights and confiding very much in those rights. The margin of safety small in case of accident, but the rights none the less secure.
*375 That the “jawing” of the collier led to confusion on the Pinta is most natural; but, given conditions of wind, weather, light, and pilotage, that very incident should have been present to the mind of the Pinta’s commander as an important element of possible danger; he should have made allowance for it; this allowance, under the circumstances, he could easily have made, the fairway being broad. That Pinta’s engine-room bell wire broke was a misfortune; but Pinta must have been too close to the brig for safety, or it would not have been deemed necessary to stop her, still less to reverse her .engines. It would have taken a relatively short distance and a moderately quick turn of Pinta’s helm to have cleared her of the brig.
To what occurred after the collision we attach (for the purposes of this case) but little importance. Pinta undoubtedly made an effort to discover whether the brig was vitally wounded. The collier’s crew were frightened, took to their boat under the conditions of disorder incident to that class of persons in that class of vessel in such an accident. After some hardship they were picked up. The collier sank. There is no reason to suppose that the crew could have saved her. She had at best small reserve floating power. It takes but relatively little water to sink a deeply laden collier; her buoyancy is usually well drawn upon before she leaves port and the character of her cargo tends to impair the pumps in case of leak. The vessel was deep in the water, laden with coal; she had a large hole in the side; she was filling very fast; there was no safe spot in the vicinity to beach her; she was soon to sink. Under these conditions we do not find that the master erred in deserting ship.
Eule 20, section 4233, Eevised Statutes, provides:
“If two vessels, one of which is a sail vessel and the other a steam vessel, are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sail vessel.
“Eule 21. Every steam vessel when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse.
“Eule 23. Where, by Eule 20 one of two vessels shall keep out of the way, the other shall keep her course.”
It therefore appears (and it is well known) that under ordinary circumstances, such as those presented in this case, the *376 duty of tbe sailing vessel is to hold her course; the duty of the steam vessel is to avoid the sailing vessel and these duties are equal. This case does not present any of the exceptions to the rule. The brig was competently manned; a sufficient, in fact (owing perhaps to the time of day) ample watch was on deck; Pinta’s lights were reported seasonably and the brig held her course; she had no other choice under the law and regulations.
We do not glean from the findings of fact that after the collision the brig failed in any duty; she was seriously wounded; she was loaded with an unwieldy and heavy cargo with little reserve buoyancy; the leak was inaccessible from the inside; the spare sails were in their usual stowage under the cabin floor aft, whence it would have taken some twenty minutes to break them out, and one can not tell how long to get one or more of them over the leak outside of the hull. Stopping the leak from inside with that cargo was impossible. The master was alone in his care (for at this time Pinta had apparently gone on); he was responsible for the lives of his wife and crew; and under these circumstances of stress he elected to take to the boat; not a pleasant choice, but one which he deemed so necessary that he submitted his wife to the hardship.
It is suggested that he might have stayed by the ship and' beached her upon a neighboring shoal; but it has been held in regard even to so placid a stream as the Hudson Biver, and so domestic a boat as a brick sloop (which floated about one-half hour after being in collision), that the crew were not obliged to remain aboard unless it was plain they could do so with safety. (Sherman Y. Fream, 30 Barbour, 478.)
Dr. Lushington, in treating this same point in the Blenheim Case, said (Spinks, 285):
“ If there be any reasonable prospect that the lives of the crew are endangered, I have determined, and I shall do so until I am overruled, that they are justified in quitting the vessel, and the consequences must fall on the wrongdoer.”
The law is clear enough, and the facts show that the brig did nothing to bring her into default.
Therefore, judgment for plaintiffs.
Authorities cited in the argument: Pitman's Case, 20 C. Cls. B., 253; Pope's Case, 21 O. Cls. B., 50; Act of Congress, 29 Stat. L., 483; Carlton's Case, 10 C. Cls. B., 485; The Carroll, 8 Wall., 302; McCabe v. Old Dominion S. S. Co., 31 Fed. Bep., *377 234; The Grace Gridler, 7 Wall., 196; The Washington, 3 Blatch., 276; Sampson’s Case, 12 0. Cls. B., 480; Thrush’s Case, 14 C. Cls. B., 435; Prescott’s Case, 19 C. Cls. B., 684; The Honpariel, 33 Fed. Rep., 524; The Star of Hope, 9 Wall., 203; City of St. Augustine, 52 Fed. Rep., 237; The Adriatic, 107 U. S. R., 512; 68 Fed. Rep., 393; The Elizabeth Jones, 112 U. S. R., 514; The Maggie J. Smith, 123 U. S. R., 349; The Nacoochee, 137 U. S. R., 330; The Manitoba, 122 U. S. R., 97; The Schmidt and The Beading, 43 Fed. Rep., 398, 815; The City of Hew York, 147 U. S., 72; The Ludwig Holberg, 157 U. S., 60; The Oregon, 158 U. S., 186; The Rebecca, Bl. and H., 347; Swift v. Brownell, Holmes, 467; The Hope, 4 Fed. Rep., 89; The Gladiator, 79 Fed. Rep., 445; The Blenheim, Spinks, 285; Sherman v. Fream, 30 Barbour, 478; The Star of Hope, 9 Wall., 203; American and English Enc., vol. 16, p. 351.