**PARTENREEDEREI M. S. BERND LEONHARDT, owner of the M/V BERND LEONHARDT, Appellant,**

v.

**UNITED STATES of America, owner of the USS SARATOGA, (CVA 60), Appellee.**

No. 10165.

United States Court of Appeals
Fourth Circuit.

Argued Feb. 10, 1966.

Decided April 3, 1968.

Albert V. Bryan, Circuit Judge, dissented in part.

William A. Grimes, Baltimore, Md. (Randall C. Coleman, and Ober, Williams

& Grimes, Baltimore, Md., on brief), for appellant.

Alan Raywid, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., and Morton Hollander, Atty., Dept. of Justice, and Thomas J. Kenney, U. S. Atty. on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and BOREMAN and BRYAN, Circuit Judges.

HAYNSWORTH, Chief Judge:

On a clear, calm night on the high seas, two ships collided after long observation of each other and the exchange of a cheery greeting. We accept the finding of the District Court that the German merchantman was at fault, but we cannot accept its absolution of the American aircraft carrier. The carrier, we think, must shoulder a full share of the responsibility for the collision.

The USS Saratoga (CVA 60) left Norfolk, Virginia, for maneuvers off Mayport, Florida. Proceeding on a southerly course of 174° at 26 knots some 35 miles off North Carolina's outer banks, her radar picked up three ships to the south when some twenty miles away. One of them was the German freighter and ore carrier, the Bernd Leonhardt, laden with ore, bound from Trinidad to Baltimore and proceeding under automatic pilot on a course of 330°. She was proceeding on her northwesterly course at approximately 13 knots. Because the weather was clear and the sea was calm, her radar was not operating, but the Saratoga was sighted from the bridge of the Bernd Leonhardt as soon as the carrier came over the horizon.

The situation presented, of course, was one of an oblique crossing, with the Saratoga the privileged or holding on vessel and the Bernd Leonhardt the burdened or giving way vessel, since the Bernd Leonhardt was off the Saratoga's port bow. If each vessel had held her course and speed, the Bernd Leonhardt would have crossed in front of the Saratoga and the

vessels would not have come closer than several thousand yards of each other. Whether the Bernd Leonhardt in that situation should have provided a wider margin of clearance by altering her course to starboard to cross later under the carrier's stern is not presented in this case, for at 2348 the carrier altered her course to the right to 190°. This was four minutes after a radar bearing from the carrier showed the Bernd Leonhardt bearing 170° true at a distance of approximately eleven miles and before the visual sightings which later controlled the maneuvers of both vessels.

This alteration of the carrier's course to the right was explained shortly after the collision as an effort to open the passage between the carrier and the Bernd Leonhardt, and one of the other ships the carrier had under observation south of her. At the trial, the Officer of the Deck testified that he came to the right to give clear passage to an unidentified ship passing up her port side, though the radar logs of the Saratoga disclosed the existence of no such ship. Nevertheless, that alteration of the carrier's course did not mislead the Bernd Leonhardt in any way because it was made before visual sighting and was unobserved. The Bernd Leonhardt's third mate, who was in command on the bridge, took bearings on the Saratoga when the carrier was on the course of 190°, observed that the bearings were moving from right to left and appraised the situation as one of a routine crossing in which the Bernd Leonhardt, the burdened vessel, would pass at a safe distance under the stern of the carrier. His appraisal of the situation was justified, for had the carrier held the new course of 190°, the Saratoga would have crossed well ahead of the Bernd Leonhardt. At 2355, however, the Officer of the Deck ordered the Saratoga to 165°, steadying before her turn was completed on 170°. That maneuver turned the carrier toward the Bernd Leonhardt, of course. There was evidence that this turn was made simply for the purpose of returning to the carrier's old

track before she went to 190°, but the contemporaneous explanation of the Officer of the Deck was that he altered his course to port for the purpose of passing under the stern of the Bernd Leonhardt. In any event, the carrier gave the Bernd Leonhardt no notice of this change in her apparent purpose and the Bernd Leonhardt was not immediately aware of it.

Meanwhile, the carrier, by blinker lights, inquired of the Bernd Leonhardt as to her identity. The Bernd Leonhardt responded by blinker signals, identifying herself, and received in turn a pleasant "bon voyage" from the carrier. It was then that the third mate of the Bernd Leonhardt observed that the relative bearings of the Saratoga were no longer moving to port.[1] Recognizing his burden to give way, he ordered the common seaman on duty with him to take the helm and to come to starboard to place the carrier off the Bernd Leonhardt's port bow. The turn was from 330° to approximately due north, though no one observed the exact heading on which she steadied for both men were observing the Saratoga.

At 2358 the Saratoga's Officer of the Deck, proposing still to pass under the Bernd Leonhardt's stern, ordered the carrier's course changed to 160° and at 2359 he ordered the turn continued to 150°. She had gotten to about 155° when, at one-half minute after midnight, a hard right turn was ordered.

At about the same time the Bernd Leonhardt was ordered hard right, but the emergency turns were too late to avoid a scraping collision along the port sides of the vessels. The port overhang of the carrier's flight deck did extensive damage to the superstructure of the freighter, and suffered substantial damage in turn.

■ Under the circumstances, we think the District Judge's findings of fault on the part of the Bernd Leonhardt are adequately supported. Her failure to observe sooner the carrier's port turns and to appreciate their extent, to see the carrier's green starboard running light when the carrier's turns placed the Bernd Leonhardt on her starboard bow,[2] and her failure to signal with her whistle her turn to starboard[3] were contributing causes of the collision. The carrier was at least equally at fault, however, for her successive turns to port and her failure to signal her intentions were grave contributing causes.

When the two vessels came within visual range of each other, the carrier was on a course of 190°. The carrier had no reason to suppose the Bernd Leonhardt had observed her earlier starboard turn from 174°, and every reason to believe the Bernd Leonhardt would rely upon the carrier's holding her course of 190°. There was no uncertainty on either vessel about the carrier's position as the holding on vessel, bound as such, to main-

1. He took a bearing on the carrier after receiving the carrier's "bon voyage" message and noticed it was approximately the same as the bearing he took before the signaling began. The earlier observed bearing drift to the left had been reversed by the carrier's turn to 170°, so that there was then an actual bearing drift to the right, but the Bernd Leonhardt's mate was unaware of it.

2. There was some contention on the part of the carrier that the Bernd Leonhardt had actually crossed the carrier's bow when the carrier was on her course of 170°. That seems impossible. Other testimony from personnel on the carrier's bridge placed the Bernd Leonhardt

in a dead ahead position, and a bearing taken after the carrier came to 160° placed the Bernd Leonhardt at 10° relative. In any event, the Bernd Leonhardt's mate must then have been in a position to have observed the carrier's starboard running light.

3. When this turn was finally observed on the carrier's bridge, it occasioned further maneuvers which, if commenced earlier, might have avoided the collision. As long as the carrier's purpose, though unknown to the Bernd Leonhardt, was to pass under the stern of the Bernd Leonhardt, a possible turn to starboard by the Bernd Leonhardt was extremely relevant.

tain her course and speed,[4] except in emergency and except for changes in course and speed which, because of the circumstances, should be readily predictable and anticipated by the burdened vessel.[5]

No emergency occasioned the carrier's port turns. There was no necessity for them. Whether prompted by a wish to return to the carrier's original track or by a desire to substitute a passage astern of the Bernd Leonhardt for the one indicated across her bows, there was nothing of necessity in the situation. Nor were there any circumstances to make those turns to port predictable on the Bernd Leonhardt. The vessels were on the high seas far from any channel or any other thing which would occasion predictable maneuvering. The Bernd Leonhardt had every right to rely upon the carrier's holding her apparently established course, and her whimsical departure from it was a gross violation of the rule. It was the carrier's violation of the rule which created the confusion on the Bernd Leonhardt, and the carrier bore a major part of the responsibility for the Bernd Leonhardt's lack of awareness of what was happening. If the carrier had held her course of 190° as required by the rule, there would have been a safe passage, and her "bon voyage" greeting would not have had a hollow ring. Her violation of her duty created the grave risk of collision the rule is designed to avoid and was a major cause of the collision.[6]

Since the record contains no basis for exoneration of the carrier, it should have been held equally at fault with the Bernd Leonhardt.

We may agree with our brother, Bryan, that the major fault was the carrier's. Her unpredictable turns to port were not only patent violations of her duty as the privileged vessel, they also occasioned the confusion on the freighter's bridge. On the other hand, we must accept the amply supported finding that the freighter reached a point at least dead ahead of the carrier when the carrier was on her course of 170°. Then and during the carrier's subsequent turn to port, the carrier's starboard running light must have been clearly visible to the freighter with its plain warning that the crossing situation was not what had been supposed. With the carrier off the freighter's starboard bow and the carrier's starboard running light showing, the freighter's unsignaled turn to starboard was so imprudent that it can not be classified as a minor fault within the major-minor fault principle when the turn played such a crucial part in bringing the vessels into collision. The carrier's reaction when the freighter's turn was finally observed strongly indicates that an earlier signal of the intended turn would have provoked an earlier right turn by the carrier and effective evasive action.

Affirmed in part; reversed in part and remanded.

ALBERT V. BRYAN, Circuit Judge (concurring in part and dissenting in part):

The navigation of the Saratoga was almost as if she were by magnetic attraction brought onto a collision course with the Leonhardt. Even without study, but on mere glance at her courses as laid out on the annexed plot, it is immediately

---

4. The Delaware, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771; The Adriatic, 107 U.S. 512, 2 S.Ct. 355, 27 L.Ed. 497; Northern Petroleum Tank S.S. Co. v. City of New York, 2 Cir., 282 F.2d 120; Zim Israel Nav. Co. v. S.S. American Press, S.D.N.Y., 222 F.Supp. 947.

5. See, e. g., United States v. S.S. Soya Atlantic, 4 Cir., 330 F.2d 732, where the privileged vessel was getting underway after dropping her pilot at the pilot boat.

6. If the Bernd Leonhardt was at fault in not signaling her intention to turn to starboard, the carrier was equally culpable in not signaling her turns to port.

SARATOGA

Point 1 → 2343
cus 174°; sp. 26 knots

Point 2 → 2348
cus 190°

Point 3 → 2355
cus 170°

Point 4 → 2358
cus 160°
2369
cus 150°

cus 000°

2357
Point 4 → 2358
Point 3 → 2355

NOTE: DIAGRAM
BASED ON 170°/11 Mi.
BEARING AT 2343.
NOT DRAWN TO SCALE;
GRIDS APPROX. 1 MILE
SQUARE.

Point 2 → 2345

cus 330°; sp. 13.5 knots

Point 1 → 2343
BERND
LEONHARDT

plain that the carrier insisted upon encroaching on the heading of the Leonhardt as she yielded to the privilege of the carrier. The majority's statement of the relative paths and positions of the vessels is convincing that the Saratoga's erratic maneuvers forced the Leonhardt into the agony of collision.

Now the court lays fault to the freighter's avoiding action. Not only was the Leonhardt not guilty of negligence, as I see it, but even if so, it did not contribute to the collision, and in any event was too slight to warrant mulcting her in half of the damages.

The maritime doctrine of equally divided damages for joint fault in collisions is a harsh remedy—it does not apportion damages on a comparative negligence ratio—and admiralty has endeavored to relieve its rigor upon the much less culpable vessel. This desire is evinced in the major-minor and the Pennsylvania rules. They are applicable here and exonerate the Leonhardt. Speaking to the presently comparable circumstances, the Court in the City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84 (1893), expounded the major-minor principle:

"Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, *sufficient to account for the disaster*, it is *not enough for such vessel to raise a doubt with regard to the management of the other vessel.* There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor." (Accent added.)

The Pennsylvania rule is that when a ship, as was the Saratoga, is admittedly in violation of a statutory duty, then, to avoid liability she must prove that her violation *could* not have contributed to cause the accident. The Pennsylvania, 19 Wall. [86 U.S.] 125, 22 L.Ed. 148 (1873). This the Saratoga has not done. On the other hand, arguendo negligent the Leonhardt has acquitted herself of any careless complicity.

As the privileged vessel, the Saratoga was obligated to hold course.[1] Her deficient seamanship is revealingly established by tracing the ships' courses. These and the points of change will be described by numbers corresponding to those on the annexed plot.

When the vessels came within visual range of each other, the Saratoga was on a course of 174°, at point 1. Her officers recognized she had the right of way and was obligated to hold course. The Leonhardt realized she was the subordinate vessel, and was prepared to fulfill her responsibility to clear the Saratoga astern. Nevertheless, the carrier then committed the following deviations from this obligation:

A. With the ships little more than seven miles apart, the Saratoga changed course to 190°, at point 2.

B. Then, about six minutes before the collision, with the vessels less than 4 miles apart and closing at a relative speed of about 39 knots, the Saratoga without signal[2] came 20 degrees to port, to 170° at point 3. This alteration—initiated only for the convenience of resuming her base course—is termed by the majority as a "whimsical departure", from her

---

1. Rules 19 and 21, International Rules of the Road, 33 U.S.C. §§ 146c and 146e:

  "§ 146c. Power-driven vessels crossing (Rule 19)

  When two power-driven vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

  "§ 146e. Vessels having right of way; duty in aiding to avert collision (Rule 21).

Where by any of sections 146–146k of this title one of two vessels is to keep out of the way, *the other shall keep her course and speed.* When, from any cause, the latter vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision (see sections 146k and 147a of this title.)" (Accent added.)

2. Rule 28(a), 33 U.S.C. § 147(a).

previous course and a "gross violation of the rule." Obviously, on 190°, the Saratoga would have passed well ahead of the Leonhardt. (The Leonhardt's later compelled turn, vide post, to starboard would have opened the gap even more.)

C. At 2358 with the vessels only about a mile and a half apart, the Saratoga compounded her earlier error by turning left to 160°, at point 4, again without signal, thus heading her nearer to the course of the Leonhardt.

This last course change, at point 4, roughly coincided in time with the Leonhardt's turn to starboard and the Saratoga thus made the collision inevitable. This turn of the Leonhardt was from her original course of 330° to 000°, immediately after the Saratoga's change to 160°. It was an avoiding action to stay to the Saratoga's port. *Defeating this* the Saratoga came even farther to port by 10° to 150°. So confronted, and still endeavoring to escape the predicament in which the Saratoga had placed her, the Leonhardt came hard to starboard. At nearly the same time the Saratoga took the same action, and the vessels scraped portside to portside.

Passing for the moment the throes of distress into which the Leonhardt had been projected by the Saratoga, it is time to look at the fault imputed to the Leonhardt by the court. Summarized it is this:

> "Her failure to observe sooner the carrier's port turns and to appreciate their extent, to see the carrier's green starboard running light when the carrier's turns placed Bernd Leonhardt on her starboard bow, and her failure to signal with her whistle her turn to starboard were contributing causes of the collision."

The Saratoga's most decisive turn was left at point 3, and the Leonhardt is criticized for not comprehending its dreadful significance. In this several factors are ignored. The turn was an unsignalled violation of the Saratoga's statutory obligation to hold her course. The import of the duty is clear, and

other courts have exonerated burdened vessels trapped into disaster by violations of this duty far less unjustified than those of the Saratoga. E. g., The Britannia, 153 U.S. 130, 14 S.Ct. 795, 38 L. Ed. 660 (1894); Hutchinson v. The Northfield, 154 U.S. 629, 14 S.Ct. 1184, 24 L.Ed. 680 (1878); cf. Yang-Tsze Ins. Ass'n v. Furness, Withy & Co., 215 F. 859 (2 Cir. 1914). As the Court in The Britannia, supra, said:

> "[T]he preferred vessel shall not interfere with or thwart the movements of * * * [the burdened ship] by bringing a new element into the calculation, which would be done if, instead of pursuing her course, she stopped her headway." 153 U.S. p. 142, 14 S.Ct. p. 799.

Thus while required to keep a watchful eye on the Saratoga, the Leonhardt could rely on the expectation that the Saratoga would comply with her duty. It is a requirement designed to assure that the movement of one of the ships in a crossing situation will be predictable to a certainty.

Leonhardt's failure to signal her turn to starboard was not a contributing cause to the collision. Since she saw the turn, the Saratoga would not have been more enlightened by a signal than she was already. United States v. S.S. Malden, 224 F.Supp. 705, 711 (E.D. Va. 1963), aff'd, 341 F.2d 292 (4 Cir.). In such circumstances this statutory duty would not be considered a defeating delinquency; it would not invoke against her the rule of The Pennsylvania. See National Bulk Carriers v. United States, 183 F.2d 405, 409 (2 Cir. 1950), cert. den. 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 631.

Nor was the failure of the Leonhardt to see the green light of the Saratoga a contributory cause. Assuming, as the court finds, that the Leonhardt was "dead ahead" when the carrier was on 170°, both her sidelights—red and green —were showing to the Leonhardt. Then, as the court also finds, the Leonhardt had not crossed the carrier's bow. To keep to the carrier's port, as she was re-

quired, the Leonhardt went to 000°. At the same time or just before this movement, the Saratoga went to 160°. At that moment the ships were only about *two minutes* from collision, and because of the Saratoga's unfathomable course changes, she was bearing down upon the Leonhardt in complete abandon of her duty. Having created the danger, the carrier can hardly be allowed to condemn the seamanship of the Leonhardt.

The majority, it seems to me, has violated the Supreme Court's caution against judgment by sternsight:

> "Whether she [the innocent ship] may not have been slightly in fault may be a close question. This is often so when *subsequent* knowledge of what might have prevented disaster tends to qualify the inquiry as to the prior duty to avert it." The Victory & The Plymothian, 168 U.S. 410, 424, 18 S.Ct. 149, 155, 42 L.Ed. 519 (1897). (Accent added.)

I find no justice in holding the Leonhardt liable for one-half of the whole damages when the entire catastrophe was brought on by the carrier.