## THE JOHNSON.

Steamers navigating in crowded channels and in the vicinity of wharves, must be run and managed with great caution, and with a strict regard to the established rules of navigation, including that one which requires them, when approaching from opposite directions, to put their helms to port. If they are about to attempt any manœuvre not usual and clearly safe, such as running in under the bows of another vessel in motion, they must not only sound their whistle or give the other proper signal, but before attempting the manœuvre must be certain also that the signal was heard and understood by the approaching vessel.

APPEAL from the Circuit Court for the Southern District of New York, in a case of collision, the case being this:

All steamers navigating the crowded waters of the New York harbor, were bound in 1863 to obey the following RULES OF NAVIGATION, prescribed originally for the conduct of passenger steamers, but adopted by other vessels.

---

\* The Legal Tender Case, 8 Wallace, 603.

"RULE 1. When steamers meet 'head and head,' it shall be the duty of each to pass to the right, or on the larboard side of the other, and either pilot, upon determining to pursue this course, shall give as a signal of his intention one short and distinct blast of his steam-whistle, which the other shall answer promptly by a similar blast of the whistle. But if the course of each steamer is so far on the starboard of the other as not to be considered by the rules as meeting 'head and head,' or if the vessels are approaching in such a manner, that passing to the right (as above directed), is unsafe, or contrary to rule, by the pilot of either vessel, the pilot so deciding shall immediately give two short and distinct blasts of his steam-whistle, which the other pilot shall answer by two similar blasts of his whistle, and they shall pass to the left, or on the starboard side of each other.

"RULE 2. When steamers are approaching each other in an oblique direction, they will pass to the right, as if meeting 'head and head,' and the signal by whistle shall be given and answered promptly, as in that case specified.

"RULE 3. If, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from the signals being given or answered erroneously, or from other cause, the pilot so in doubt shall immediately signify the same by giving several short and rapid blasts of the steam-whistle, and if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerage-way, until the proper signals are given, answered, and understood, or until the vessels shall have passed each other.

"RULE 4. The signals, by blowing of the steam-whistle, shall be given and answered by pilots, in compliance with these rules, not only when meeting 'head and head,' or nearly so, but at all times when passing or meeting, at a distance within half a mile of each other, and whether passing to the starboard or larboard.

"N. B. The foregoing rules are to be complied with in all cases, except when steamers are navigating in a crowded channel or in the vicinity of wharves; under these circumstances steamers must be run and managed with great caution, sounding the whistle as may be necessary, to guard against collisions or other accidents."

With these rules in force, the Burden, a small propeller

tug, was towing up the East River from Atlantic Dock, Brooklyn, the canal boat Kate McCord, heavily loaded w⁺th wheat, she being fastened to the larboard side of the propeller. The propeller with her tow was on her way from the Atlantic Dock, on the Brooklyn side of the East River, to Pier 44, on the New York side of it, and in a direct line from the dock to the pier. The tide was the middle of the ebb, running strongly down. In consequence of the shape of the land from Catharine Ferry to Atlantic Dock, there is a strong eddy tide which runs up along the Brooklyn shore to the upper side of the Fulton Ferry slip, when the tide is running ebb, and tugs bound up seek that eddy tide for the double reason that they get the aid of the eddy tide instead of the opposition of the ebb tide, and they avoid vessels bound down, leaving to them the advantage of the ebb tide and the breadth of the river. The propeller was, accordingly, going slowly up in that eddy tide 100 to 150 feet from the Brooklyn piers, and when she had nearly reached the ferry slip she saw the Scranton, a large side-wheel steamer, with an empty barge on each side, coming rapidly down the river, out towards the middle of the river just above the Fulton Ferry.

The Scranton, when about opposite the upper part of the Fulton Ferry slip, starboarded her helm, and at a rapid rate swept in, in a curve toward the Brooklyn shore, with the purpose of running in under the bow of the propeller, and picking up a boat lying on the lower side of the lower pier of the Fulton Ferry slip.

The propeller, seeing the steamer thus coming dangerously towards her, blew one whistle, which is the regulation signal to indicate that she intended to keep to the right, and those on the steamer testified that *she* blew two whistles, which is the regulation signal that would have indicated that she was going to the left; but the men on the propeller did not hear the two whistles, and of course gave no answering signal. Indeed, had they heard them, the men on the propeller, as it rather seemed, could not at that time have done anything to prevent the collision, situated as the propeller

Diagram of the East River.

was. The result was that the steamer ran directly into the canal boat, which was lashed to the propeller, and did her and her cargo serious injury; also injuring herself.

The owners of the canal boat libelled both the steamer and the propeller to recover her damage by the collision, alleging a joint or several negligence; and the owners of the steamer libelled the propeller to recover her damage by the collision, alleging negligence of the propeller alone.

The District Court held that both steamers were in fault, and decreed against them jointly for the whole loss. The claimants of both vessels appealed to the Circuit Court. That court reversed the decree of the District Court so far as it affected the propeller, and charged the whole loss upon the steamer, on the ground she was wholly in fault.

From this decree the claimant of the steamer appealed to this court, and the libellants did likewise. The evidence was somewhat voluminous, but not very conflicting on the material points.

*Mr. Fithian, for the steamer; Mr. Benedict, for the propeller; Mr. Van Santvoord, for the canal boat.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Damages were claimed in this case on account of a collision which occurred in East River, on the ninth of December, 1863, between the canal boat Kate McCord, and the steamboat Joseph Johnson, whereby the canal boat and her cargo, consisting of seven thousand bushels of wheat, were greatly injured.

Prior to the commencement of her trip, the canal boat was lying in the Atlantic basin at Brooklyn, and the proofs show that she was heavily laden, and that she was taken in tow there by the steam propeller William F. Burden, to be towed up the river to pier forty-four, on the New York side of the river, for the purpose of discharging her cargo and delivering the same on board of the ship Whampoa, then lying at that pier. She was lashed to the port side of the propeller, and when the collision occurred, the propeller with the canal

boat in tow was proceeding up the river to the place where her cargo was to be transshipped.

Loss was sustained by the owner of the canal boat and by the owners of her cargo, and they joined in the same libel, claiming damages, as well of the propeller to which the canal boat was lashed as of the steamboat Joseph Johnson, which collided with the canal boat, and which was the immediate cause of the injury both to the canal boat and her cargo.

Lashed to the propeller as the canal boat was, she was as entirely under the control of the propeller as if she had been a part of that vessel. When they were proceeding on their course up the river, the Johnson, with two unladen canal barges in tow, one on each side, started from Corlear's Hook, on the New York side, on a trip down the river, inclining, however, towards the Fulton Ferry dock, on the Brooklyn side, to a point just below the lower slip of that dock, where she intended to take another boat in tow. When the boats started on their respective trips it was about eleven o'clock in the forenoon, and the tide at that time was half ebb, with a strong current in the channel of three miles an hour.

Vessels of that description proceeding up the river on that side, in that state of the tide, usually keep close to the shore, as they by that means avoid the downward current in the stream, and get the aid of the eddy or reflex tide near the shore, which facilitates their progress, and the evidence shows that the propeller, with the canal boat in tow, was proceeding up the river along that shore in the track usually pursued by steamtugs in performing towage service under those circumstances.

Boats descending the river at ebb tide usually select the middle of the channel, as their speed is much aided by the current, and the witnesses generally concur that the Johnson, until just prior to the collision, was proceeding down the river in a course much nearer the centre of the stream than the ascending boat with her tow lashed to her port side.

Aided by the current the speed of the descending boat was seven miles an hour; but the propeller with the canal boat

in tow was not able, in ascending the river, to make more than three or four miles an hour.

Whatever may have been the cause, it is admitted by the master of the Johnson that he did not see the propeller until she was opposite the slip next above the ferry slip, and he also states that the propeller, at that time, was about the same distance below the ferry that the Johnson was above that point, and of course they were not far distant from each other.

They were approaching at a combined speed of ten or eleven miles an hour, but not exactly from opposite directions nor on lines precisely parallel, as the Johnson was nearer to the centre of the stream than the propeller, and her course was inclining towards the Brooklyn shore. Strong doubts, however, are entertained whether the vessels would have collided if both had kept their course, but it is not necessary to decide that point, as it is conceded that the helms of both were changed before the collision occurred.

Appearance was regularly entered by the owners of the steamers, and the claimants of each steamer filed separate answers, denying that their vessel was liable for the injury, but the District Court held that both vessels were in fault, and entered a joint decree for the libellants in conformity with the allegations of the libel. Dissatisfied with the decree the claimants of the respective steamers appealed to the Circuit Court, where all the parties were again heard, and the Circuit Court affirmed the decree of the District Court as against the Johnson, but reversed it as against the propeller, holding that the Johnson was wholly in fault for the collision. Whereupon the claimants of the Johnson appealed to this court, and the libellants also appealed from so much of the decree as held that the propeller was not in fault.

All persons engaged in navigating vessels upon navigable waters, whether upon the seas or in rivers or harbors, are bound to observe the rules of navigation recognized and approved by the courts in the management of their vessels on approaching a point where there is danger of collision

Such rules are ordained and administered to prevent collision and to afford security to life and property exposed to such dangers, and experience shows that if they are seasonably observed and strictly followed such disasters would seldom occur.*

Rules of navigation are obligatory upon vessels approaching each other from the time the necessity for precaution begins, and they continue to be obligatory as the vessels advance, so long as the means and opportunity to avoid the danger remain. They are not strictly applied to a vessel which is otherwise without fault in cases where the proximity of the vessels is so close that the collision is inevitable, and they are wholly inapplicable when the vessels are so distant from each other that measures of precaution have not become necessary to prevent a collision. But precautions, in order to be effectual, must be seasonable; and if they are not so, and a collision ensues because they were not adopted earlier, it is no defence to show that they were adopted as soon as the necessity for the precaution was perceived, nor to prove that at the moment of the collision it was too late to render such a precaution of any service. Unless precautions are seasonable they are of little or no use, as it will seldom or never happen that a collision could be avoided at the time when it occurred.†

Steam vessels, independently of the sailing rules enacted by Congress, are regarded in the light of vessels navigating with a fair wind, and are always under obligations to do whatever a sailing vessel going free or with a fair wind would be required to do under similar circumstances.‡

Prior to the passage of the act of Congress prescribing sailing rules, as well as since that time, steam vessels approaching each other from opposite directions, so as to involve risk of collision, were required to put their helms to port so that each may pass on the port side of the other, and the court is of the opinion that that rule is applicable in this

---

* Steamship v. Rumball, 21 Howard, 383.
† The Governor, 1 Clifford, 97.    ‡ St. John v. Paine, 10 Howard, 583.

case, although the collision occurred before that act of Congress went into operation.*

Suppose it to be true that these vessels were approaching each other on intersecting lines, so that they would have collided if they had not changed their course, then it is clear in view of the circumstances that each was bound to port their helm and pass to the right, as there was nothing to prevent them from complying with that well-known rule of navigation. They were navigating in the daytime and in good weather, and they had an unobstructed view of what was before them; but the Johnson, instead of complying with that rule of navigation, put her helm to starboard for the purpose of crossing to the Brooklyn side and taking another boat in tow, which was lying in the dock, just below the lower slip of the Fulton Ferry. Descending the river, as the Johnson was, at the rate of seven miles an hour, she obeyed her helm readily, and aided by the reflex tide as she left the stream she came round quickly so as to head towards the shore, and as she advanced on her new course she struck the canal boat on her port side and caused the injury described in the libel.

Complaint is made by the appellant that the propeller was in fault, but the court is of the opinion that what the propeller did was correct, and that she left nothing undone which, under the circumstances, was required of her by the rules of navigation. When the master of the propeller saw that the Johnson was heading directly towards the canal boat, he ported her helm, which was all he could do at that time, as the collision was inevitable. Some benefit, no doubt, resulted from the movement, as it doubtless diminished the force of the blow and lessened somewhat the injury to the canal boat and her cargo.

Unexplained, the appellant concedes that the attempt of the steamboat to cross the track of the propeller before she passed up, would not be warranted by the rules of navigation, but he alleges in argument that the Johnson, before

---

* The Sussex, 1 Robinson, 275; The Niagara, 3 Blachford, 37.

she starboarded her helm, gave notice to the propeller, by blowing her steam-whistle twice, that she intended to make that change in her course and go to the left, but the weight of the evidence is the other way, and the theory of the defence is expressly contradicted by the answer, which must be regarded as alleging the true state of the case.

Whether tested by the pleadings or the evidence, the case shows that the helm of the steamboat was put to starboard when, if changed at all, it should have been put to port, and that the steamboat was put upon a course heading towards the Brooklyn shore, across the track of the propeller, before the steamboat blew her whistle, as alleged by the appellant.

Even supposing it were otherwise, and that the theory of fact assumed by the appellant could be sustained, still the court is of the opinion that it would constitute no valid defence in this case, for several reasons, which will be briefly explained : (1.) Because the respective vessels, as they approached each other, were in such close proximity that the steamboat had no right to insist upon any departure from the ordinary rules of navigation.   (2.) Because any such departure from the rules of navigation as that contemplated by the steamboat, necessarily involved danger of collision, as the propeller was nearer to the shore than the steamboat. (3.) Because the steamboat, even if she did blow her whistle before she starboarded her helm, still she had no right to change her course until it was certain that the signal was heard and understood by the approaching vessel.   (4.) Because the signal, even if given before the order to starboard, was nevertheless too late to justify the steamboat in attempting to cross the bows of the propeller; but the court is satisfied that the signal, if given as alleged by the appellant, was not understood by those in charge of the propeller, and that it was culpable rashness, in view of the circumstances, for the steamboat to attempt to cross the bows of the propeller before receiving any signal that the propeller was willing to co-operate in the proposed change of course.

Those on board the steamboat received no answer to their signal, and it is reasonable to suppose that if they were at-

tentive to their duties they must have known that those in charge of the propeller did not understand their signal, and consequently if they made the proposed change in the course of their steamer, a collision would follow, and if they did not so understand the matter, it was their own fault.

Viewed in any light, the propeller was not at fault, and the responsibility must rest on the steamboat. Our conclusion is, that the Johnson is liable for the whole damage, and that the decree of the Circuit Court should be in all things affirmed.

Appeal was taken by the libellants from so much of the decree as exonerated the propeller, but their claim, in the view of this court, is against the colliding steamboat, and not against the propeller.

DECREE IN EACH CASE AFFIRMED.