300 F.2d 496
 OCEAN MARINE LIMITED, as owner of THE Steamship SAN JUAN,
Libelant-Appellant,
v.
UNITED STATES LINES COMPANY, Steamship THE AMERICAN CHIEF,
Moran Towing& Transportation Co., Inc., and Tug
THE MARTHA MORAN, Respondents-Appellees.
 No. 185, Docket 26933.
 United States Court of Appeals Second Circuit.
 Argued Jan. 11, 1962.
Decided March 16, 1962.
 
 John H. Hanrahan, Jr., of Foley & Martin, New York City, for libelant-appellant.
 Elmer C. Maddy, of Kirlin, Campbell & Keating, New York City (Roy C. Megargel, New York City, on the brief), for appellees United States Lines Co. and Steamship American Chief.
 Kenneth H. Volk, of Burlingham, Underwood, Barron, Wright & White, New York City (Eugene Underwood and Robert F. Lynch, of Burlingham, Underwood, Barron, Wright & White, New York City, on the brief), for appellees Moran Towing & Transportation Co., Inc., and Seaboard Shipping Corp.
 Before LUMBARD, Chief Judge, and CLARK and FRIENDLY, Circuit Judges.
 CLARK, Circuit Judge.
 
 
 1
 Libelant, Ocean Marine Limited, owner of the steamship San Juan, appeals from the decision below holding the San Juan solely liable for damages sustained by that steamship and the barge Seaboard No. 77 as a result of a collision in New York Harbor between the San Juan and the Seaboard No. 77, then in tow of the tug Martha Moran. Judge Noonan rejected the San Juan's claims that the collision was caused by the fault or negligence of the Martha Moran, or of a fourth ship not actually in collision, the steamship American Chief, owned by appellee United States Lines Company. Instead he held that the collision was caused solely by the fault and negligence of the San Juan.
 
 
 2
 The collision occurred in the early evening of December 2, 1957, off St. George, Staten Island. Both the San Juan and the Martha Moran, with her tow, were proceeding out the Kill Van Kull on an eastward course that would take them across New York Harbor. The Martha Moran, in the lead, was headed for the Brooklyn Army Base. Following and overtaking the tug was the San Juan, whose destination was the Todd Shipyard at Erie Basin, Brooklyn. The American Chief, a fast vessel, was proceeding swiftly southward on a course of 208 degrees down the harbor from Pier 59 on the North River.
 
 
 3
 A few minutes before the collision, when the American Chief was in the vicinity of buoy 24, she shifted her course to 180 degrees; as a result the bearing of the San Juan opened. At about this time the Martha Moran, fearing a collision with the American Chief, turned to port. The pilot of the San Juan, occupied with other traffic and located on the port wing of her bridge, did not immediately observe this change of course; and the tanker had no lookout on her bow. The tug's shift in course brought her across the San Juan's bows, and although both ships maneuvered to avoid collision, the tanker's bow collided with the barge Seaboard No. 77, damaging it.
 
 
 4
 Libelant claims, inter alia, that the American Chief had committed a statutory fault when, as the burdened vessel in a crossing situation, she failed to give way to the privileged vessels, and that this violation of Article 19 of the Inland Rules of the Road, 33 U.S.C. 204-- and of Articles 22 and 23, 33 U.S.C. 207, 208-- had led to the collision. Libelant further claimed that the Martha Moran had committed several statutory faults, and was negligent.
 
 
 5
 Judge Noonan rejected all these claims and held that the San Juan herself had violated the Inland Rules in several regards: she had failed to have a proper lookout, she had overtaken the Martha Moran without giving proper signals, she had failed to stay clear of the tug, and she had failed to reverse her engines in sufficient time once the danger of collision had become apparent. As to the American Chief, which had gone down the harbor without stopping for the other vessels, Judge Noonan held that no crossing situation ever existed between that vessel and either the San Juan or the Martha Moran and her tow; hence the Rules of the Road as to crossings never became applicable. For these reasons he dismissed the libel as to the United States Lines Company, the American Chief, the Martha Moran, and the Moran Towing & Transportation Co., Inc., and awarded provable damages to the Seaboard Shipping Corp., owner of the Seaboard No. 77.[1]
 
 
 6
 The crux of this appeal is whether the district judge erred in finding that the rules of the Board governing crossing situations were inapplicable to the American Chief. Article 19 of the Inland Rules, 33 U.S.C. 204, states that: 'When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other.' The other cited rules define more specifically the obligation to keep out of the way. The vessels were crossing, and the American Chief unquestionably had the other ships on her starboard, so that the question for determination is whether the crossing involved 'risk of collision.' Judge Noonan found that the collision was 'not probable' and that a crossing situation was not developing because 'the course change at buoy 24 and the speed of the American Chief would have easily negated any possibility of collision.' Based on these findings, Judge Noonan held that the American Chief was never in a position vis-a-vis either the San Juan or the Seaboard No. 77, in tow of the Martha Moran, to make applicable the rules for steam vessels crossing.
 
 
 7
 The Rules of the Road precribe certain clear-cut obligations for vessels in a crossing situation. Once they become operative no deviation from their dictates is permitted. The rules are familiar to all masters and pilots, and each of the vessels in a crossing situation may presume that the other will comply with the rules. They are designed to prevent collisions; any vessel whose violation of a rule leads to a collision is held liable for damages caused by it. Of course they govern navigation only from the time the need for precaution begins. New York and Liverpool U.S. Mail S.S. Co. v. Rumball, 62 U.S. 372, 21 How. 372, 16 L.Ed. 144. The question of when such necessity arises is to be determined by application of objective standards; the fact that the vessel under scrutiny did not perceive the need for care matters not at all. The Johnson, 76 U.S. 146, 153, 9 Wall. 146, 19 L.Ed. 610; Griffin on Collision 20-21 (1949).
 
 
 8
 Since the rules are designed to prevent the risk of collision as well as collision itself,[2] it is not necessary for a collision to be imminent or even probable before the obligation imposed by them accrues. The courts have expressed this concept in various ways. Said Judge Addison Brown: 'There is danger or risk of collision whenever it is not clearly safe to go on.' The Aurania, D.C.S.D.N.Y., 29 F. 98, 123. While Judge Learned Hand put it thus: "Risk of collision' does not mean certainty of collision; but only that prudence demands that the navigators shall watch each other's navigation, and be prepared to do whatever safety may demand.' Secony Vacuum Transp. Co. v. Gypsum Packet Co., 2 Cir., 153 F.2d 773, 776. In short, a situation may involve risk of collision before there is actual danger, but 'when the relation between the vessels is such that danger may shortly arise, if the rules are not obeyed.' Griffin on Collision 23 (1949). Once vessels enter into such a potentially dangerous relationship, their obligations are fixed.
 
 
 9
 An example may serve to clarify the factors which determine whether a situation involves the risk of collision. In Socony Vacuum Transp. Co. v. Gypsum Packet Co., supra, 2 Cir., 153 F.2d 773, the Voco collided in lower Delaware Bay with the Gypsum Prince. Each vessel had a speed of about 10 knots; the collision occurred at night. When the Voco first sighted the Gypsum Prince, that vessel was two and a half to three points off her port bow at a distance estimated to be between two and a half and three miles. Two minutes later the Voco changed her course 8 degrees to starboard; at that time the Gypsum Prince was about three quarters of a mile away. The court found that the situation prior to the change of course involved the risk of collision, and that for that reason the slight course change constituted a statutory fault. It is noteworthy that the court reached this conclusion despite its finding that the ships would not have collided had each kept her course and speed.
 
 
 10
 For these reasons, a finding that collision is not probable clearly does not preclude a conclusion that the situation involves the risk of collision. Moreover, the fact that the course change made by the American Chief at buoy 24 'would have easily negated any possibility of collision' could not affect the American Chief's obligation to navigate in accord with the rules of the road if the situation prior to the course change involved the risk of collision. For as the burdened vessel the American Chief not only had an obligation to keep out of the way of the privileged ships, but also was obliged to avoid crossing ahead of the other vessels. Inland Rules, Article 22, 33 U.S.C. 207. And if a violation of these statutes caused in whole or part the collision between the two vessels coming out of the Kill, the American Chief must at least share the liability.
 
 
 11
 The pilot of the San Juan testified that he first sighted the American Chief when the San Juan was off St. George in the vicinity of buoy 2, and the American Chief was abeam of Caven Point. The American Chief was on a course of 280 degrees at that time, moving at a speed of 13 knots. The San Juan was heading on a course of 110 degrees at approximately 9 knots. Rough calculations indicate that had the vessels continued on these courses, they would have met at a point southeast of buoy 24 approximately 5 minutes from the time the San Juan sighted the American Chief. In this period both vessels altered course, but these changes did not affect the situation. The course change of the San Juan to 85 degrees would not have lessened the risk of collision, and the American Chief did not change course until she reached buoy 24, approximately 1.15 miles from the point where the San Juan sighted her. If the facts were as the San Juan's pilot testified, it would be difficult to conclude that the situation did not involve the risk of collision, for if either ship exercised bad judgment there might have been a collision. Similarly, at some point the conjunction of the courses of the Martha Moran and the American Chief may have involved a possibility of collision. Certainly if a situation where crossing vessels will not collide if they hold their courses can involve risk of collision, the instant situation, where the evidence suggests that the vessels might have collided if they stayed on course, would involve such a risk. Compare Socony Vacuum Transp. Co. v. Gypsum Packet Co., supra, 2 Cir., 153 F.2d 773.
 
 
 12
 The testimony was conflicting, and it is clear that the district judge discredited much of what was said below. Because he took an erroneous view of what constitutes a risk of collision, his findings failed to focus on those aspects of the testimony which would determine what was the possibility of collision before the American Chief's change of course. Moreover, he located the Martha Moran and the collision in Anchorage 23, a finding which is highly improbable in view of the unquestioned courses which the tug and the tanker were following. And that finding has little support in the record outside of the wholly incredible testimony of Captain Dunnett, Master of the American Chief, that before the collision the tug was in the southern portion of Anchorage 23. To have reached such a position, the tug would have had to turn almost 90 degrees off course and proceed in that direction for almost a mile, or over half the distance then remaining in her voyage. Therefore, we find it necessary to reverse for a new or further hearing (as the district court may determine) in order that these issues can be considered and specific pertinent findings made.
 
 
 13
 Of course, even if it is found that the situation involved the risk of collision as we have defined that condition, further findings must be made and conclusions reached as to whether the American Chief's maneuvers were improper, whether they caused the collision, and whether other vessels also were at fault, so that a division of damages must be adjudged. We find it unnecessary to consider any of the other issues raised below, since their adjudication rests on factual determinations which may be altered following the further proceedings here ordered.
 
 
 14
 Reversed and remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 Seaboard Shipping Corp. and Moran Towing & Transportation Co., Inc., which prevailed below, have filed protective appeals. Our resolution of the appeal of Ocean Marine Limited requires us to dismiss these appeals, and it is so ordered
 
 
 [2]
 The Beryl, 9 Prob.Div. 137, 5 Asp. 321 (1884), cited in Griffin on Collision 23 (1949)