UNITED STATES of America, owner of the U.S.S. GEARING, Libelant,

v.

S.S. MALDEN, her engines, boilers, tackle, etc., in rem, and against Eastern Gas and Fuel Associates, a trust organized and existing under the laws of the State of Massachusetts, owner of the S.S. Malden, in personam, Respondents.

MASSACHUSETTS TRUSTEES OF EASTERN .GAS AND FUEL ASSOCIATES, MYSTIC STEAMSHIP DIVISION, owner of the Steamship Malden, Libelants,

v.

The UNITED STATES of America, owner of the U.S.S. Gearing (DD–710), and other Naval vessels steaming in the same formation, their engines, boilers, machinery, tackle, apparel, furniture, etc., Respondent.

Petition of The MASSACHUSETTS TRUSTEES OF EASTERN GAS AND FUEL ASSOCIATES, MYSTIC STEAMSHIP DIVISION, as Owner of the S.S. Malden, for exoneration from or limitation of liability in a cause of limitation of liability, civil and maritime.

Nos. 8042, 8044, 8082.

United States District Court
E. D. Virginia,
Norfolk Division.

Dec. 31, 1963.

Alan Raywid and Charles D. Ferris, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., Claude V. Spratley, Jr., U. S. Atty., for libelant.

Robert M. Hughes, III, and Charles R. Dalton, Jr., Seawell, McCoy, Winston & Dalton, Norfolk, Va., for respondents.

NORTHROP, District Judge.*

These cases arise out of a collision between the USS GEARING (DD–710) and the SS MÁLDEN which occurred in the early morning of July 10, 1959, in international waters near the entrance to Norfolk Harbor. A libel, Admiralty No. 8042, was filed by the United States, as owner of the GEARING, against the MALDEN and her owners, Massachusetts Trustees of the Eastern Gas and

Fuel Associates, Mystic Steamship Division, for collision damages.[1] A second libel, Admiralty No. 8044, was filed by the owners of the MALDEN against the United States for collision damages. Subsequently, the owners of the MALDEN filed a petition, Admiralty No. 8082, for limitation of liability to the value of the vessel. This petition was allowed and liability was limited to $410,000.[2]

Following the collision, a hearing was held before a Coast Guard Investigating Officer in Norfolk on July 13–16 and July 22, 1959. A Naval Court of Inquiry met in Norfolk on July 17, 1959. Numerous depositions were taken in the four-year period between the collision and the trial. The case came on for hearing on June 3, 1963, and final arguments were heard on September 9, 1963, on briefs submitted by both parties.

The MALDEN is a steam-driven, liberty-type ship of 6,753 gross tons, having a maximum speed of about 11½ knots, unladen. At the time of the collision, her master was James F. Lusby, who had filled that position since July 7, 1945. The GEARING is a steel-hulled destroyer of some 2,390 tons displacement, and capable of speeds in excess of 30 knots. The GEARING possesses the high maneuverability characteristic of our modern naval destroyers. At the time of the collision, her captain was Commander John R. Hankey.

In the early hours of July 10, 1959, the MALDEN was outbound from Norfolk to Boston, while the GEARING was steaming inbound to Norfolk in a naval formation, being the seventh ship in a column of destroyers. The weather was clear and visibility was, at all pertinent times, in excess of 10 miles. Both the MALDEN and the GEARING had proper navigation and range lights burning; and neither was using its radar—in the case of the GEARING, because her surface search radar was inoperative.

---

* Of the District of Maryland, sitting by designation.

1. Throughout this opinion, "libelant", where used, refers to the United States; and "respondent" refers to Massachusetts Trustees of Eastern Gas & Fuel Associates, Mystic Steamship Division.

2. Order by Hoffman, C. J., May 31, 1960.

It is agreed by both parties that the naval formation was proceeding at base speed of 13 knots on a course of 245° true at 0430 hours E.D.T.[3] on July 10, 1959. The distance between destroyers in the column was approximately 500 yards, and the column heading would bring the formation to the vicinity of Buoy 2CB. The lead ship of the column, the USS MULLINIX (DD 944) held Buoy 2CB about 600 yards on her port beam at approximately 0459 hours, following which a pre-arranged plan called for the formation to "proceed independently" into Norfolk, requiring its members to maintain reasonable position in the formation.

The MULLINIX immediately came right to 310°, steadied momentarily and then continued farther right through 320° to 330°. The second ship in the column, the USS STORMES, (DD 780) made her turn in the wake of the MULLINIX and steadied on 320°. The third column element, the USS FOX (DD 799) first came slightly left of 245° and then made her right turn to 325°. The fourth, the USS STRONG (DD 758) turned in the wake of the FOX to 320°, as did the fifth ship, the USS MANLEY (DD 940). The sixth ship, the USS McCARD (DD 822) also came slightly left of 245° and then swung right in the wake of the MANLEY. The course of the USS GEARING before the collision is a matter of some dispute, but it is clear that she came left on full rudder some time before she commenced her column turn to the right. The eighth ship, the USS GYATT (DDG 1) completed the column turn and held the collision slightly forward of her port beam.

The movements of the MALDEN are also the subject of dispute, but it is clear

that at 0439 hours she set course 130°–132° for Buoy 2CB. This course was held until about 0500 when she came right to 155°, then altered to 145° in the interval of time prior to final evading action at 0514 and the collision. At the moment of collision, the MALDEN was headed 167° as shown by her gyro repeater.

The court has carefully reviewed all the testimony elicited at the trial, at prior proceedings, and on deposition, and has paid special attention to the testimony of witnesses who were, in the court's opinion, in the best positions to observe the pertinent happenings. These persons are Commander Richard N. Moss and Lt. Cmdr. C. Stribling Snodgrass of the McCARD and Lt. James P. Goodge of the GYATT.

The court finds that the GEARING was at fault in this collision, and that the MALDEN was not. Any fault attributable to the MALDEN is too remote from the collision to allow the GEARING to invoke the "Pennsylvania rule" with regard to statutory contributing fault, The Pennsylvania v. Troop, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873).

## I—The Collision

From a review of all the evidence, the court finds that the GEARING was at fault in her failure to complete her turn properly and avoid the MALDEN. The court finds that this was a crossing situation under Rule 19 of the International Rules of the Road, 33 U.S.C. § 146c (1957),[4] with the MALDEN being the privileged, and the GEARING the burdened, vessel. This has not been shown to be a condition of "special circumstances" under International Rule 27, 33 U.S.C. § 146k (1957).[5]

---

3. All times given will be Eastern Daylight Time, as used by the MALDEN. The naval formation was on Standard Time.

4. Rule 19: "When two power-driven vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

5. Rule 27: "In obeying and construing [these Rules] due regard shall be had to all dangers of navigation and collision, and to any special circumstances, including the limitations of the craft involved, which may render a departure from the above Rules necessary in order to avoid immediate danger."

Rule 27 is subject to very strict construction against the vessel claiming its benefit.

"Exceptions to these rules, though provided for by rule 24 [now Rule 27], should be admitted with great caution, and only when imperatively required by the special circumstances of the case." The Oregon, 158 U.S. 186, 202, 15 S.Ct. 804, 811, 39 L.Ed. 943 (1895).

And a ship trying to justify resort to Rule 27

"takes upon herself the obligation of shewing both that her departure was at the time it took place necessary, in order to avoid immediate danger, and also that the course adopted by her was reasonably calculated to avoid that danger." The Agra and The Elizabeth Jenkins, L.R. 1 P.C.App. 501, 504 (1867).

The GEARING has not satisfied this obligation. Diagrams of the two versions of the collision advanced by the parties are appended in the margin.[6]

■ The court also finds that the GEARING cannot take advantage of the *in extremis* doctrine [7] as to any faulty movements she made because they were not produced by fault or mismanagement of the MALDEN, The Elizabeth Jones, 112 U.S. 514, 526, 5 S.Ct. 468, 475, 28 L.Ed. 812 (1884).

The testimony of Commander Moss of the McCARD, which is accepted by the

6.

Government version

MALDEN

GEARING and Column

Collision T. P.

MALDEN version

MALDEN

Column

GEARING and Column

GEARING

T. P.

Collision

T. P.= column turning point

(Not accurate as to bearings in order to allow for clarity of details; distances not to scale.)

-ii-

7. The Bywell Castle, 4 P.D. 219 (C.A. 1879) (Brett, L. J.)

court, indicates that when the McCARD had come right to 325°, the MALDEN was dead ahead, but held a target angle of 350° on the McCARD. The testimony of Commander Goodge of the GYATT, the ship following the GEARING, indicates that when the GYATT had come right to 315°, the MALDEN was dead ahead, still heading slightly to the port of the column. Thus, neither of these ships observed the MALDEN crowding the column, but rather saw her headed on her desired course of about 145°, being the reciprocal of 325°.

McCARD witnesses also stated that when she passed the MALDEN, she was on an approximately reciprocal course at a range of 500 to 700 yards.

██ The position of the MALDEN in relation to the naval column, at the time of first sighting by the MULLINIX, was such as to constitute the MALDEN the privileged vessel in a crossing situation, International Rule 19, 33 U.S.C. § 146c (1957). The court finds, based on the graphic exhibits in this case, Claimant's [the United States] Ex. Nos. 3–14, 18–19, 22–25, relating to the position of the MALDEN as each naval vessel completed its turn, that the same situation applies in relation to the GEARING. Any obstruction of her line of sight to the MALDEN could not possibly have taken place until after the third vessel in the column had rounded the turning point. Where both vessels involved in a collision are properly lighted, and one of them is able to see the other, that latter one cannot attempt to show that special circumstances exist, but is governed rather by the ordinarily applicable rule of the road. Accordingly, this case must be governed by International Rule 19, and the duties and privileges of both vessels are to be judged on this basis, regardless of any subsequent alteration of bearings or courses, until the time when both were *in extremis,* Griffin, Collision, § 22 (1949), Ocean Marine Ltd. v. United States Lines Co., 300 F.2d 496, 1962 Am.Mar.Cas. 2305 (2d Cir. 1962). As was said by the Supreme Court in The Johnson v. Mc-

Cord, 9 Wall. 146, 153, 76 U.S. 146, 153, 19 L.Ed. 610, 611 (1870):

"But precautions, in order to be effectual, must be reasonable; and if they are not so and a collision ensues because they were not adopted earlier, it is no defense to show that they were adopted as soon as the necessity for the precaution was perceived, nor to prove that at the moment of the collision it was too late to render such a precaution of any service."

Cases cited by the libelant relating to ships not being "in sight of" each other are not apposite here, because they do not involve two properly lighted ships, Lind v. United States, 156 F.2d 231 (2d Cir. 1946), 1945 Am.Mar.Cas. 907.

Ignoring for the moment any course changes by the MALDEN, it is clear that the GEARING failed to take proper avoiding action.

██ It was testified by Lt. Goodge, Officer of the Deck of the GYATT, that when the GYATT had completed her turn so as to follow in column, she was some 75 yards to the right of the GEARING's wake. The court finds that the GEARING was wide in her turn and that this was the proximate cause of the collision. The United States seeks to make much of the fact that the MALDEN failed to steer clear of the column after it made the turn. This ignores the fact that the MALDEN was the privileged vessel in a crossing situation, and cannot be put to the test of defending her course on the basis of a meeting situation. The burden was on the members of the column to avoid the MALDEN's projected steady course at a constant speed. This burden is very heavy, in view of the fact that the MALDEN was headed 167° at the moment of the collision. The slow speed and lack of maneuverability of the MALDEN would indicate that she must have commenced her right turn from some heading close to one reciprocal to the column if she was able to reach 167° at the moment of impact. Further, "courts are rather unwilling to judge

strictly the avoiding action taken by the privileged vessel, when, as here, this action must be taken *in extremis* due to the fault of the burdened vessel." Pacific-Atlantic S.S. Co. v. United States, 175 F.2d 632, 640, 1948 Am.Mar.Cas. 1727 (4th Cir.), cert. denied, 338 U.S. 868, 70 S.Ct. 143, 94 L.Ed. 532 (1949).

## II—Statutory Faults

 Libelant and respondent urge several statutory faults against each other. The court finds that any faults of the MALDEN were not, and could not have been, contributing faults to the collision.

## A—The MALDEN

The MALDEN is charged with an improper change of course to port and failure to sound proper whistle signals. The court finds that the MALDEN's course change from 155° to 145°, logged by the MALDEN at some time between 0505 and 0514 E.D.T. could not have contributed to the collision for two reasons. First, it was too remote in time and distance from the collision, in that the GEARING had not sighted the MALDEN at that time; and second, a course of 145° was either reciprocal to, or opening from the courses of the first six ships.

As to whistle signals, witnesses on the McCARD testified that the MALDEN sounded a single whistle blast and commenced a starboard turn while on the McCARD's port beam at 300 yards, approximately. Based on this, the MALDEN was steering well clear of the column turning point and also was returning to her original course of 155°. So, had the GEARING been taking proper avoiding action based on the original crossing situation, the collision could not have occurred.

The MALDEN's failure to sound two whistle blasts on coming left from 155° to 145° also could not have contributed to the collision. Since the GEARING was not aware of the course being steered by the MALDEN, knowledge that the MALDEN was coming left would obviously not have affected the GEARING's actions. And the GEARING should have been aware of the MALDEN's presence based on the first signal from the MULLINIX relating to sighting of a contact. The MALDEN's right turn from 145° immediately preceded the collision and a proper signal was given, albeit not heard by the GEARING. While it is possible that a two-whistle blast sounded at the time of the earlier turn would have called the GEARING's attention more particularly to the presence of the MALDEN, it would only have called the GEARING's attention to her duty in a crossing situation. The Lynn, 21 F. 815 (S.D.Ga. 1884). It follows that this collision was brought about by lack of watchfulness and care on the part of the GEARING.

## B—The GEARING

The GEARING is charged with failure to abide by the "starboard-hand" rule (International Rule 19, 33 U.S.C. § 146c (1947)) and failure to sound proper whistle signals (International Rule 28, 33 U.S.C. § 147 (1947)).

 The question of violation of the starboard-hand rule has already been treated above and determined against the GEARING. The signals sounded by the GEARING have been disputed. The court finds that the GEARING failed to sound two blasts on coming left from a course of approximately 315°. But, the court finds that this failure could not have contributed to this collision because the MALDEN saw the GEARING turn left to a collision course. The maneuverability of the MALDEN was such that she would not have been able to avoid the GEARING, even had she had a few seconds additional warning of an impending left turn.

## III—Other Faults

 Each party charges the other with faults alleged to be contributing faults and to constitute negligence, although non-statutory. The burden is on the party making such a charge to show the fault *did* contribute to the collision.

## A—The MALDEN

■ The MALDEN is charged with failure to take bearings on the turning point, failure to make use of her radar, and improper lookout. These faults, the court finds, did not contribute to the collision. The MALDEN's activities in attempting to determine the location of the column turning point are alleged by the libelant to have been negligent. Libelant points to the MALDEN's failure to ascertain the risk of collision by carefully watching the compass bearing of the turning point, in accordance with the Preliminary Note to The International Steering and Sailing Rules, 33 U.S.C. § 146(2) (1957).[8] The court finds that this failure was non-negligent. As has been said:

> "[T]he preliminary note is not a rule of navigation, but merely a suggestion of one method of determining a risk of collision from a particular compass bearing of an approaching vessel. It does not determine or assume to suggest that all other compass bearings involve no risk of collision, *nor does it suggest the only method of determining a risk of collision* under the conditions mentioned." Wilder's S.S. Co. v. Low, 112 F. 161, 166 (9th Cir. 1901) [emphasis supplied]

In this case, the MALDEN in fact had the turning point under visual observation for some time prior to the collision. The action taken by her was taken in a timely manner, and it cannot be said that she would have had any reason to act differently had she taken bearings in the manner suggested.

The court reaches the same conclusion with regard to the MALDEN's failure to make use of her radar. There is no evidence to suggest that there were any vessels in the immediate area which were not sighated visually by the MALDEN. The visibility was about 10 miles, and the column was held under continuous observation by the master for about one hour prior to the time of the collision. He saw the GEARING when she came out of the column track and he took immediate action to avoid collision by coming right. The court finds as a fact that the final heading of the MALDEN, 167°, indicates rapid action on her part, and leads to the conclusion that the use of radar would not have aided the avoidance of the collision.

It should be noted that the master's purely visual observations of the naval column led him to steer 145° which was essentially reciprocal to the column headings. Thus, he was able to estimate accurately the track of the naval vessels without use of pelorus or radar.

The lookout on the MALDEN was admittedly standing his first watch on that vessel, but he was also an experienced seaman. His attitude during the taking of depositions was certainly uncooperative, but does not go to his competence. Even if he were found to be an improper lookout, it would not affect any ruling here, because the conning officer of the MALDEN was in possession of all necessary information available to the lookout. Thus, any failure of the lookout could not, with reasonable possibility, have had anything to do with the collision, see Esso Standard Oil Co. v. Oil Screw Tug Maluco I, 212 F.Supp. 449 (E.D.Va.1963).

## B—The GEARING

■ The GEARING is charged with negligence in proceeding at an unreasonable speed under the circumstances. This has not been proved. She was in column and holding the same speed as her attendant ships. This was not excessive, as shown by the safe passage of the first 6 ships in the column and the MALDEN. Rather, the fault of the GEARING lies in her navigation and lookout. She was highly maneuverable and could have been expected to avoid the MALDEN at the speed she was hold-

8. "Risk of collision can, when circumstances permit, be ascertained by carefully watching the compass bearing of an approaching vessel. If the bearing does not appreciably change, such risk should be deemed to exist."

ing, if she had been aware of the situation.

She is also charged with failure to maintain a proper lookout. The lookout maintained by the GEARING was incompetent. This is the only reasonable characterization of a man admittedly unqualified, untrained and inexperienced. In addition, Captain Hankey said that he would not have had this man on watch to his knowledge, because he regarded the man as unqualified. It cannot be denied that this is a fault which contributed to the collision. Had the lookout sighted the MALDEN when he reasonably should have, this collision should never have occurred. It is clear that no one on the GEARING was aware of the MALDEN's position until the GEARING had commenced her right turn from 245°. The court finds that the GEARING has not sustained her burden "to show by clear and convincing evidence that it did not so contribute", Anthony v. International Paper Co., 289 F.2d 574, 581 (4th Cir. 1961).

## IV—Liability of the Naval Column

Respondent urges that faults of the first 6 ships in the column contributed to the happening of this collision, thus subjecting the column to *in rem* liability. While it is true that these 6 ships failed to warn the GEARING or to sound whistle signals, they cannot be held to have contributed to the collision. What they saw in making their turns should have been equally visible to the GEARING had she been navigated properly.

Respondent has consistently argued that a naval flotilla has no special privilege under the Rules of the Road. Now it wishes to be heard to say that the members of the flotilla had special duties to each other. In the visibility and lighting situation of this case, there would have been no notice to the other ships to warn the GEARING. There was no hidden or sudden danger.

Cases cited by respondent, Pacific-Atlantic S.S. Co. v. United States, supra, and United States v. The Australia Star, 172 F.2d 472 (2d Cir. 1949), involved blacked-out convoys in wartime conditions. The duty to warn is more easily implied in such circumstances. In the Pacific-Atlantic S.S. Co. case, supra (New Mexico-Oregon collision), the Fourth Circuit, speaking through Judge Dobie, made no specific finding of a positive duty to warn. In that case, other ships in the naval formation attempted to warn the merchant vessel, but not the battleship which was involved in the collision. A charge of negligence against these other ships was held to be without substance. Here it was not due to any improper order or failure to warn that the collision occurred. Rather, it was the result of actions taken solely by the GEARING. See Publicover v. Alcoa S. S. Co., 168 F.2d 672, 678 (2d Cir. 1948), 1948 Am.Mar.Cas. 963.

Respondent argues that this case differs sufficiently from United States v. S.S. Washington, 241 F.2d 819 (4th Cir. 1957), to bring *in rem* liability on the first 6 destroyers in the column. It has not shown this. Both in the Washington case and this case, there is not a sufficient connection between the actions of the other ships and the contributing fault of the colliding naval ship. Moreover, this case is much closer to the Pacific-Atlantic S.S. Co. case, supra, and the court feels it is controlled by that case.

Alleged faults of Admiral Ramage, the Officer-in-Tactical-Command of the formation, aboard the Cruiser BOSTON, do not constitute a basis of liability as to that ship. See United States v. S.S. Washington, supra, 241 F.2d at 826. English authority cited there bears out this proposition, especially The Sobieski [1949] P. 313, 322–323 (C.A.). The theory there set forth is that even where a formation commander is negligent, there can be *in rem* liability against his vessel only if she was guilty of faulty navigation contributing to the collision.

## V—Conclusion

On the basis of the above findings of fact and conclusions of law, the GEAR-

ING is the sole party at fault in this collision. The MALDEN, the first 6 destroyers in the naval column, and the USS BOSTON are free of contributory fault.

The foregoing embodies this court's Findings of Fact and Conclusions of Law pursuant to Rule 46½ of the Rules of Practice in Admiralty & Maritime Cases. Counsel will frame a decree settling liability in accordance with these findings.