THE OREGONIAN. THE HANDICAP. AMERICAN–HAWAIIAN S. S. CO. v. BRUUSGAARD KIOSTERUD DAMP-SKIBS AKTIESELSKAB (two cases).

Circuit Court of Appeals, Ninth Circuit. February 18, 1929.

No. 5523.

Norcross, District Judge, dissenting.

A. B. Winfree and William C. McCulloch, both of Portland, Or., and Louis T. Hengstler and Frederick W. Dorr, both of San Francisco, Cal., for appellant.

Erskine Wood and Wood, Montague & Matthiessen, all of Portland, Or., for appellee.

Before RUDKIN and DIETRICH, Circuit Judges, and NORCROSS, District Judge.

DIETRICH, Circuit Judge. This is an appeal from an interlocutory decree entered in a maritime collision case, dividing the damages and referring the matter to a master in chancery to fix the amount thereof.

The collision between the steamship Oregonian, owned by the appellant, and the motorship Handicap, owned by appellee, took place in the channel of the Willamette river from 200 to 300 feet below the lower end of Swan Island shortly before 8 o'clock in the morning on September 28, 1926, the weather being clear. At this point the river is about 450 feet wide. The channel between Swan Island and the east bank of the river is approximately 300 feet wide, and about three-eighths of a mile upstream from the point of the collision it makes an easterly bend of about 45 degrees. The two vessels sighted each other when the Handicap, proceeding downstream, was rounding this curve. They were then about three-fourths of a mile apart and equidistant from the point of collision. The Oregonian immediately sounded one blast of her whistle, indicating a port-to-port passing, and by a like signal the Handicap assented. The Oregonian was well on her right-hand side of the channel, heading for the ranges on the lower end of Swan Island. Observing almost immediately that the Handicap was making the bend so wide as to crowd over to her port side of the channel, the pilot of the Oregonian blew a danger signal, and thereupon he put her engines full speed astern, at the same time advising the Handicap of such action by three blasts of the whistle. Upon sighting the Oregonian, the Handicap had changed her engines from slow ahead to full ahead on her port engine and full astern on her starboard, and, upon hearing the three blasts from the Oregonian, she answered with a like signal, and put her port engine also full astern. A very short time thereafter—less than two minutes—the Handicap's bow struck the Oregonian a glancing blow on her port side a little abaft midships, and, probably due to the impact, her stern then swung into contact with the stern of the Oregonian. Almost simultaneously the latter ran aground at the lower end of the island. As to just what occurred at the last moment and as to the relative positions of the two vessels immediately before and immediately after the collision the testimony is conflicting, but we are inclined to the view that the Oregonian kept her course toward the island ranges, and that she was forced aground by the Handicap. Referring to the Handicap's contention that the pilot of the Oregonian was at fault in so maneuvering as to cause her to swing out diagonally across the channel, the lower court, after a

review of the conflicting testimony, seems to have reached the conclusion that, whatever may have been the precise position of the Oregonian immediately before the collision, a clear channel was left for the Handicap 300 feet in width, and that this was ample for her safe passing had she "been properly navigated." With this finding we are content. The Handicap, it should be said, was 415.3 feet long and 54.7 beam; the Oregonian was of approximately the same dimensions.

By the lower court it was held that the Handicap was at fault not only in not proceeding on the right-hand side of the channel but also in not increasing her speed after sighting the Oregonian, to the end that the passing might be made in the wide channel below the island. In connection with this latter point it was said that, having "the right of way" in the narrow channel, the Handicap should have assumed that the passing would be made below the island, and that, had she acted upon that assumption and "made ordinary headway," the collision would have been avoided. It is important to consider this contention only because of the bearing it impliedly has upon the obligations of the Oregonian. Manifestly, if the Handicap had such right of way, and should have acted upon such an assumption, the Oregonian was bound to refrain from attempting to enter the narrow channel until the Handicap had emerged therefrom. It was upon this ground and no other that the lower court charged her with responsibility for the accident and accordingly divided the damages. But we find no substantial basis for holding that the Handicap had the right of way, if by that is meant exclusive right. The section of the river referred to was the only navigable channel between Portland and the sea. Naturally it was less easily navigated than were the wider and straighter stretches of the stream, but in no legal sense was it dangerous. Under no rule, usage, or necessity was it a one-way channel, and in competent and careful hands ships were daily meeting and passing in it without mishap. There is no substantial testimony to the contrary, and that the Handicap understood such to be its status and the practice the record leaves no room for doubt. Upon sighting the Oregonian and receiving the port-to-port passing signal she assented, and immediately, so she claims, sought the starboard channel, and checked, or at least did not increase, her speed. Admittedly navigation in the center of the stream is preferable, and, if she expected, or had the right to expect, that the Oregonian would wait for a passing in the open water, why did she not follow this easier course and increase her speed? She gave no warning, and apparently was not surprised upon learning of the Oregonian's intention to enter the narrow channel. The danger signal was given, not by her, but by the Oregonian, and the latter first put her engines full speed astern. What then is meant by the contention that the Handicap had "the right of way" we do not understand. Both vessels had the right to proceed, for a port-to-port passing, each being under obligation only to use skill and caution commensurate with the exigencies of a channel, which, though comparatively narrow and sinuous, was continually being navigated. True, when the danger of collision became apparent, the greater duty was upon the Oregonian to stop, but this because, being the ascending vessel, her ability to stop was greater, and not because she was at fault in seeking to enter the channel. The Galatea, 92 U. S. 439, 23 L. Ed. 727. That she failed in the discharge of this duty there is no substantial ground for believing. The lower court did not find any want of care or skill in this respect or sustain the Handicap's contention that the Oregonian was athwart the channel at the time of collision.

It must therefore be held that the Oregonian was not at fault, and accordingly the decree is reversed, with directions to take further proceedings not inconsistent herewith.

NORCROSS, District Judge, dissents.