**ESSO STANDARD OIL COMPANY, a foreign corporation, Libellant,**

v.

**OIL SCREW TUG MALUCO I and BARGE #127, their furniture, engines, tackle, apparel, etc., in rem, and M. F. Martin, Jr., Southern Transportation Co., Inc., and American Dredging Co., as owners and/or operators and/or charterers of said vessels, in personam, Respondents.**

**ESSO STANDARD OIL COMPANY, Libellant,**

v.

**The OIL SCREW TUG MALUCO I, her furniture, engines, tackle, apparel, etc., and M. F. Martin, Jr., Respondents.**

Nos. 8037, 8057.

United States District Court
E. D. Virginia,
Norfolk Division.
Jan. 16, 1963.

450

Seawell, McCoy, Winston & Dalton, Leon T. Seawell, Jr., and Robert M. Hughes, III, Norfolk, Va., for Esso Standard Oil Co.

Breeden, Howard & MacMillan, Robert R. MacMillan, Norfolk, Va., James J. Bierbower, Washington, D. C., for Tug Maluco I and Martin.

David H. Batchelder, Jr., Norfolk, Va., for American Dredging Co.

WALTER E. HOFFMAN, Chief Judge.

In cross-libels filed by Esso Standard Oil Company and American Dredging Co., Inc., damages are sought to be recovered as a result of a collision between the M/V ESSO POTOMAC, owned and operated by Esso Standard Oil Company, and the Barge #127, owned and operated by American Dredging Co., Inc., which barge was under tow by the Oil Screw Tug MALUCO I, owned by M. F. Martin, Jr., and under an oral charter to Southern Transportation Co., Inc. The collision took place during the early morning hours of April 30, 1959, at or near the upper abutments of the Woodrow Wilson

Bridge, then in the course of construction across the Potomac River between Jones Point on the Alexandria side of the river and an undescribed area on the Washington side of the river to the east.

The first action was instituted in this court on June 18, 1959, same being No. 8037. In personam service was obtained on Southern Transportation Co., Inc. and American Dredging Co., Inc. during August, 1959. In the interim Esso Standard Oil Company filed an action in the Southern District of Georgia, Brunswick Division, against the tug Maluco I *in rem* and M. F. Martin, Jr. *in personam.* It should be noted that American Dredging Co., Inc. was not a party to the proceeding in Georgia. By order dated September 30, 1959, the Georgia proceeding was transferred to this court by agreement. On March 14, 1960, the two cases were consolidated for trial. Prior to the date of consolidation, but subsequent to the entry of the order of transfer, American Dredging Co., Inc. filed its answer, counter-claim and cross-claim praying a recovery of damages from Esso Standard Oil Company "and from such other respondents as may be found liable for said damages." A citation was issued only against Esso Standard Oil Company. Proctors for the tug MALUCO I and Martin suggested, at the time of trial, that their clients were not parties to any action instituted by American Dredging Co., Inc. The court ruled that process could be issued at a later date and proceeded to hear the controversy as though process had been issued and the tug MALUCO I and M. F. Martin, Jr. were parties to a claim for damages filed by American Dredging Co., Inc., with the right of the parties so affected to file pleadings and present further evidence, if necessary.

By order dated May 16, 1960, Southern Transportation Co., Inc. was dismissed as a party respondent.

At or near the site of the construction of the Woodrow Wilson Bridge the Potomac River runs approximately north and south. Libellant's tanker, the ESSO POTOMAC, was headed north, upstream, aided by a flood tide determined to be approximately one and one-half knots. The Barge #127 was made up to the tug MALUCO I, headed south, downstream, working against the tide. While there is a sharp conflict in the testimony as to where the collision between the barge and tanker occurred, the court finds that the bow of both vessels had entered the abutment area hereinafter described, which area extends 100 feet in a north-south direction as measured by cofferdam 2E established along the west (or Alexandria) side of the Potomac River.

The ESSO POTOMAC is a tanker, 256 feet in length, 40 feet abeam, equipped with 615 H.P. twin screws and readily maneuverable even when her engines are put full astern. On the early morning in question—near 1:00 A.M. on April 30, 1959—she was transporting a cargo of gasoline from Norfolk to the Esso Standard Pier in Alexandria and, after unloading a portion of her cargo, had contemplated proceeding to Washington to discharge the balance of the load. She had a freeboard of approximately 6 feet from the waterline to the top of the bulwark at the stem of the vessel. Her wheelhouse is 77 feet aft of the stem and is situated about 16 feet above deck. Her engines are operated from the wheelhouse by air control. The tanker was operated and controlled by her mate, Knight, and an able-bodied seaman, Jackson, both of whom were in the pilothouse, with the mate at the wheel and handling the controls. There was no bow lookout on duty.

The tug MALUCO I is 65 feet in length, with a waterline length of about 60 feet, a beam of 17½ feet, and has a 500 H.P. maximum, with a continuous 400 H.P. The tug had been operating in the Potomac River area for approximately 17 days prior to the collision. She remained on the job about two weeks after the collision and left the area upon the termination of her duties. During the time in question the tug was engaged in towing mud scows from an area in the Georgetown Channel—considerably north of the point of impact—to a dump-

ing ground approximately one and one-half miles south of Jones Point and somewhat north of Rosier's Bluff. On the occasion in controversy the port side of the tug was made up on the starboard quarter aft of Barge #127, and the two vessels were moored with three 7 inch lines. For a few minutes prior to the collision the flotilla was under the control of the mate, Stubbs. The captain, Gale, was asleep in his bunk; the cook was asleep; two men were designated to hold down combined engine room-lookout duties, one was on duty but had gone below, the other was presumably asleep. Also aboard the tug was a Government inspector, employed by the Army Engineers, whose duties consisted of seeing that proper running lights were on Barge #127 and that the barge was carried to the proper dumping ground. The inspector, Prince, had spent 37 years working around the Potomac River and her tributaries; he likewise held a license to operate vessels not exceeding 65 feet in length. About 15 minutes before the impact Prince had been in the wheelhouse with Stubbs, but thereafter went below to examine some official mail which had been delivered to the tug earlier that day.

The Barge #127 is an unmanned mud scow, 120 feet in length and 40 feet in width. As made up to the tug, the stern of the tug was overhanging the aft end of the barge approximately 10 feet. The wheelhouse of the tug was about 75 feet from the bow of the scow.

There is little or no dispute as to the location of the physical damage sustained by the ESSO POTOMAC and the Barge #127. The tanker's damage was on the stem, there being some indication that the tanker was on a slight angle at the moment of impact. The stem of the tanker struck the bow of the barge, a little to the port side of the center of the scow.

At the construction site of the bridge certain cofferdams or abutments had been erected, extending eastwardly into the Potomac River from the Alexandria side. Cofferdam 2E marked the western line of the temporary channel available for water traffic during the construction of the bascule and adjacent spans of the bridge.[1] This temporary channel had been in use for several months prior to April 30, 1959, and a notice to mariners, dated October 8, 1958, had been seen by the master of the ESSO POTOMAC. At a distance slightly in excess of 200 feet to the east of cofferdam 2E, one or two poles or piles were located to mark the eastern line of the channel. As heretofore noted, cofferdam 2E runs 100 feet, in a north-south direction, along the western channel line. Blinking red lights were located on the northern and southern ends of 2E, as well as on the pile or piles marking the eastern channel line.[2]

Those aboard the ESSO POTOMAC insist that the channel through the abutment area was only about 100 feet in width, this despite the fact that her master was aware of the prior notice to mariners which plainly refers to the channel as being 200 feet in width. They urge that shoal water existed immediately off the eastern channel line and that this necessitated the tanker maintaining a course directed to the middle of the channel. The erroneous assumption as to the width of the temporary channel pointedly suggests the primary cause of the collision. If, in fact, the channel had been only 100 feet in width at the construction site, it is understandable that the ESSO POTOMAC, having a 40 foot beam and with shoal water along the eastern line of the channel, would be desirous of approaching the abutment area at a reasonably close distance to cofferdam 2E marking the western line of the channel. Those aboard the ESSO POTO-

1. Cofferdams 3E and 4E, as shown on MALUCO Ex. 1, had not been erected at the time of the collision. They are referred to on the exhibit as "future cofferdams."

2. The record is not clear as to whether there were two piles on the eastern channel line in the abutment area. Reference to the cofferdam or abutment area will be to 2E unless otherwise specified.

MAC estimate the distance between the tanker's port side and the eastern edge of cofferdam 2E at 30 feet and 35 to 40 feet. Without intimating that the foregoing estimates of distances are accurate, they manifestly prove that the ESSO POTOMAC was to her left of the center line of the channel. The evidence conclusively establishes that the channel at the site of construction was 200 feet in width.[3] While there is some evidence tending to show that the starboard side of the tanker passed 25–30 feet distant from the dolphins on the east side of the channel, these statements are rejected as the attention of the tanker's pilot was essentially directed to cofferdam 2E through the operation of the tanker's searchlight made necessary because of background lights and the confusion created by four flashing green construction lights established along the western channel line only approximately eight hours prior to the collision.[4]

It is patently clear that each vessel intended a port-to-port passage in the channel. At that point the agreement between the parties essentially ends. The ESSO POTOMAC contends that the stern of the tanker had cleared the northern end of the abutment area at the time the impact took place. The MALUCO I argues that the bow of Barge #127 was approximately even with—or a trifle south of—the southern end of the abutment area when the collision occurred. Resolving this conflict, together with disputes as to distances and whistle signals, depends upon the credibility of the witnesses, their interests in the outcome of the case, the physical facts and many other factors touching upon the issue of credibility.

It is conceded that visibility was excellent, although the ESSO POTOMAC correctly points out that vessels proceeding north on the Potomac River are somewhat confused by the background of lights from the National Airport and other places in Washington. As the tanker makes a regular run between Norfolk and Alexandria and/or Washington, these lights should not adversely affect the navigation of a northbound vessel once the navigator, thoroughly familiar with these conditions, has had an opportunity to adjust his vision to the surroundings. As to the flashing green buoy markers placed along the western edge of the channel without prior notice to mariners, they would excite an interest to navigators but should not have constituted any hindrance to prudent navigation on a perfectly clear night.

Vessels heading north on the Potomac River pass Rosier Bluff—a point approximately 2800 yards from the construction site. About 2100–2200 yards further upstream vessels pass, on their starboard hand, flashing red gas buoy 2—this buoy being an estimated 600 yards from the construction site. There are contradictions in the testimony of the ESSO POTOMAC as to when Knight or Jackson first realized that they were meeting a tug and tow. Knight, the mate, said that he first saw the running lights of the approaching tug and tow when the bow of the tanker was 250 feet from the south end of cofferdam 2E, at a time when the tug and tow were 3000 feet upstream somewhat north of buoy 4 and on the eastern side of the channel. In answers to interrogatories, the ESSO POTOMAC stated that those in charge of the tanker initially became aware of the fact that they were meeting a flotilla "when the vessels were approximately 600 feet apart;" that they first noticed a searchlight on the approaching vessel "at a distance of approximately 2½ miles;" and they first became aware of the fact

3. It is probable that the distance between cofferdam 2E and the dolphin or dolphins on the eastern side was in excess of 200 feet. Certainly the dolphins would be placed outside the channel line and there is evidence to support this statement.

We shall treat the *clearly navigable* channel as 200 feet in width.

4. The notice to mariners as to the establishment of these flashing green lights was not given until several days following the collision.

that the tug was alongside the starboard side of the barge when the vessels were "600 feet apart." Jackson, the A/B seaman, testified that he first saw all of the lights on the tug and barge when the tanker was halfway between buoy 2 and the bridge—a point about 225 yards south of the area of construction. Thus the statement of Jackson substantially coincides with the answers to interrogatories. Jackson further testified that he immediately reported these facts to the mate. The Court finds that Knight and Jackson first observed the running lights and all other displayed lights on the tug and tow when approximately 700 feet apart. All parties aboard the tanker point to a rapid succession of whistle signals from the ESSO POTOMAC. Knight and Jackson suggest that the one blast whistle indicating a port-to-port passage was sounded upon noticing that a tug and tow were approaching; that there was no response; that immediately thereafter Knight sounded the danger signal, followed by three blasts indicating that his engines were in reverse, and he thereupon put his wheel hard right. The tanker's assistant engineer stated that the danger signal followed the passing signal after an interval of 3 to 5 seconds; the captain described the intervening time as "about ½ minute later" and "a few seconds later." Assuming, without deciding, that the tanker blew a whistle signal indicating a port-to-port passage, it is reasonable to believe that the vessels were then in dangerously close proximity to each other and that the ESSO POTOMAC was still approaching the construction site at the time the first signal was given by the tanker.

The mate on the tanker argues that the impact occurred after the stern of the ESSO POTOMAC had cleared the northern end of the abutment area—in the vicinity of nun buoy 4 which is located on the eastern side of the channel about 275 feet north of the abutment area. Jackson, the seaman, states that the wheelhouse of the tanker (77 feet from the stem of the vessel) was passing through cofferdam 2E and that the apron of the wheelhouse was about through the construction area when the collision took place. The evidence in behalf of the MALUCO is more persuasive. The testimony of the Government inspector is to the effect that he looked to the cofferdam with the idea of jumping if necessary, and the cofferdam was 5 to 6 feet distant from the starboard side of the tug when the tanker and barge collided. While the court is unable to accept the testimony of the tug's mate, Stubbs, to the effect that the bow of the barge was about even with the southern end of cofferdam 2E at the moment of impact, the preponderance of the evidence tends to show that the collision occurred in the abutment area consisting of 100 feet, and that the bow of the barge probably entered the abutment area a split second before the bow of the tanker crossed the southern line of cofferdam 2E as extended in an east-west direction.

The tug pilot and Government inspector each testified that the tug gave a one-blast signal prior to the receipt of a like signal from the tanker. The pilot states that this was given when the tug and scow were about 300 feet north of cofferdam 2E. The inspector heard the tug sound a one-blast signal and, after about two minutes, heard the same signal from the tanker, followed by the danger signal "just as quick as you could wink your eye, almost." As each vessel intended a port-to-port passage, and as those aboard the vessels knew they were approaching each other, it is unnecessary to determine which vessel first sounded the passing signal. If required to do so, the court would accept the testimony of the tug pilot and Government inspector, as their version of the signals is essentially corroborated by the rapidity of the signals as related by those aboard the tanker.

Both Knight and Jackson agree that the tanker's searchlight (1000 watt) was essentially in continuous use, primarily directed to cofferdam 2E, as the ESSO POTOMAC approached the construction site. With the slight bend in the channel the searchlight would be in

the eyes of the on-coming tug proceeding southerly along the western side of the 200 foot channel. The tug pilot contends that the use of the searchlight prevented him from seeing the running lights of the tanker and, therefore, the true course of the tanker could not be determined. He concedes that the searchlight was dead ahead, but he had a right to assume that the vessels were contemplating a port-to-port passage in the narrow channel, until the contrary appeared to him in the exercise of prudent navigation. The Victory (The Plymothian), 168 U.S. 410, 426, 18 S.Ct. 149, 42 L.Ed. 519. The tug and barge were crowding the extreme western side of the channel to a point where it would have been unsafe to veer to the starboard any further without striking cofferdam 2E. It is perhaps true that the tug and barge could have stopped before entering the abutment area, but the temporary channel remained 200 feet in width for a distance of more than 600 feet north of the construction site and, with the erroneous assumption on the part of those in charge of the tanker that the channel was only 100 feet in width and their efforts to keep close to cofferdam 2E, there is little likelihood that there would have been any different result even if the tug and barge had become dead in the water. Moreover, the burden rests upon the ESSO POTOMAC to establish the fault of the MALUCO and, as the fault of the tanker is obvious and inexcusable, the evidence against the MALUCO must be clear and convincing to make out a case for apportionment. The Victory, etc., supra.

■ Great stress is placed upon the existing flood tide which, to a limited extent, affected the ability to maneuver the ESSO POTOMAC which was proceeding upstream with the tide. At the same time it is recognized that the MALUCO could more effectively reduce her speed and hold her position over the ground against the head tide. Varying estimates as to the force of the flood tide range between one knot and two and one-half knots. An acceptable estimate is one and one-half knots. The ESSO POTOMAC argues that there was a duty upon the MALUCO to refrain from entering the abutment area with the tanker approaching. While it is clear that when the danger of collision becomes apparent, the greater duty to stop rests upon the ascending vessel, The Galatea, 92 U.S. 439, 23 L.Ed. 727, this creates no legal right-of-way in the descending vessel which permits the latter to enter the confined channel area to the exclusion of the ascending vessel. The Oregonian, 9 Cir., 30 F.2d 781. Under certain circumstances where the danger of collision is imminent, the law favors the vessel which has the tide under foot, but where the channel, although narrow and perhaps more confined in the abutment area, is continuously being navigated through a 200 foot passage by all types of vessels, it would be error to hold that the ascending vessel (MALUCO) was required to wait until the descending vessel (ESSO POTOMAC) had cleared the construction site before proceeding against the tide; at least until such time as the danger became, or should have become, apparent to the ascending vessel. Such action would effectively establish a one-lane channel; a condition that did not exist on the night in question, although apparently those in charge of navigation on the ESSO POTOMAC were of the opinion that the channel should be so categorized by reason of their mistaken belief that the width was only 100 feet. The facts of this case do not support the contention that the ascending vessel (MALUCO) knew, or should have known, of the danger of collision in sufficient time to avoid entering the abutment area and, as previously indicated, the channel was approximately the same width north of the cofferdam as in the confined area between the dolphins and cofferdam 2E. Admittedly it is not a good practice to attempt to pass a passenger vessel in the cofferdam area due to possible mechanical failures which may create a loss of control, but the universal custom points to the passage of vessels in this temporary channel and the fact that the ESSO PO-

TOMAC sounded a passing signal at a point very close to the construction site is some proof of knowledge that such practice was followed.

■■ The MALUCO admits that no lookout was maintained on the tug or barge. Nor was any lookout on the bow of the tanker. Such failures are treated as statutory faults. It imposes a harsh burden upon the offender. We need not discuss the failure of the ESSO POTOMAC to maintain a bow lookout. As to the MALUCO there is credible evidence that a bow lookout on the tug or barge would have been unable to see the tanker's running lights any better than the tug pilot. The determining question is whether the absence of a lookout on the tug or barge could, with reasonable possibility, have anything to do with the collision. We think that this inquiry must be answered in the negative. As in The Georg Dumois, 4 Cir., 153 F. 833, 835, the ESSO POTOMAC was continuously within the view of the tug pilot for a distance in excess of two miles and the tanker's searchlight was at all times observed as the vessels approached the construction site. If the searchlight prevented the tug pilot from seeing the running lights, it is highly unlikely that a bow lookout on a lower level could have aided the cause by giving any information not already known by the tug pilot. The Farragut, 10 Wall. 334, 77 U.S. 334, 19 L.Ed. 946; The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943. Even assuming arguendo that a bow lookout may have detected the tanker's running lights in sufficient time to have warned the tug pilot that the tanker's course was dead ahead, the fault of the ESSO POTOMAC was so gross that the major-minor fault rule would be appropriate. The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; Webb v. Davis, 4 Cir., 236 F.2d 90; Compania Nacional De Navegacao

Casteiro Patrimonio v. Cabins Tanker Industries, Inc., 4 Cir., 285 F.2d 592; White Stack Towing Corporation v. Bethlehem Steel Co., 4 Cir., 279 F.2d 419; Gratsos v. The Moisie Bay, 4 Cir., 287 F.2d 706.

When the searchlight from the tanker was finally cut off a matter of seconds before the impact, the tug pilot knew that a collision was unavoidable. For the first time he saw the tanker's running lights which disclosed the course to be dead ahead. He is criticized for not sounding his danger signal. By this time the tanker had sounded her danger signal and the purpose of any signal from the MALUCO would have been destroyed.

■ A review of these proceedings points to one glaring fault on the part of those charged with navigating the ESSO POTOMAC—a clear violation of Article 25 of the Inland Rules, 33 U.S.C.A. § 210. Compounding this major fault, there was an improper use of the tanker's searchlight in violation of § 80.34 of the Pilot Rule for Inland Waters and a failure to adhere to her port-to-port passing signal. Rejecting in the entirety the tanker's suggestion that the tug and tow were proceeding along the eastern side of the channel in approaching the construction area, the court finds that the ESSO POTOMAC was solely at fault for the collision of April 30, 1959.

Adopting this memorandum in lieu of specific findings of fact and conclusions of law, proctors for tug, her owner, and American Dredging Co., Inc., will collaborate in the presentation of appropriate decrees to be entered in the pending actions, after first presenting the decrees to proctors for libellant for inspection and endorsement. Damages to the barge owned by American Dredging Co., Inc., will be referred to a Commissioner unless otherwise agreed upon by the parties.