**HESS TANKSHIP COMPANY, Libelant,**

v.

**S.S. M. L. GOSNEY, etc., in rem, and Petroleum Tankers, Inc., etc., in personam, Respondents.**

**No. 8185.**

United States District Court
E. D. Virginia,
Norfolk Division.

Nov. 24, 1963.

Seawell, McCoy, Winston & Dalton, Norfolk, Va., for libelant.

Baird, Crenshaw & Ware, Norfolk, Va., for respondents.

WALTER E. HOFFMAN, Chief Judge.

In cross-libels the HESS DIESEL, owned by libelant and cross-respondent, and the M. L. GOSNEY, owned by respondent and cross-libelant, seek damages for a collision between the two vessels which occurred during the early morning hours of February 9, 1961.

At 0458 hours on the morning in question the HESS DIESEL got underway from Sewells Point anchorage bound for the Phillips 66 terminal on the southern branch of the Elizabeth River. The tanker was fully loaded and drawing approximately 30 feet of water.

At approximately the same time the M. L. GOSNEY, a tanker operated by Sinclair Refining Company, backed out into the Elizabeth River channel from the Portsmouth terminal of Sinclair Refining Company. The vessel was in ballast, bound for Houston, Texas.

The courses of the two vessels required them to pass in the channel. Both ships had licensed pilots aboard for the purpose of directing navigation. At the time of departure each vessel was exhibiting regulation navigation lights which were properly set and burning brightly. As will be hereafter noted, there is a conflict as to whether the lights on the M. L. GOSNEY were burning a few minutes prior to the collision. The weather was clear and dark; the tide was ebbing; there was a northwest wind blowing about 15 knots.

In the vicinity of Craney Island, while inbound, the HESS DIESEL overtook and passed on the port side the M/V NUMERIAN, after first giving and receiving proper signals. This movement brought the HESS DIESEL to the center of the channel in the vicinity of Buoy #23, notwithstanding her pilot's general practice to "stay far to the right." At the time the passage of the NUMERIAN was effected the channel was apparently clear of traffic ahead but in this connection it should be noted that the channel course bends rather sharply to the left at Buoy #27 and again at Buoy #29. Thus an inbound vessel in mid-channel opposite Buoy #23 could not see the navigation lights of an outbound vessel adhering to her proper place in the channel approaching Buoy #29.

Both vessels proceeded until they neared the Lamberts Point Coal Piers, located on the eastern side of the Elizabeth River channel in the vicinity of Buoys #29 and #27, and extending somewhat northwardly from Buoy #27 in the direction of Can Buoy #25. Apparently each vessel decided to give a passing signal at exactly the same moment. The M. L. GOSNEY gave a one blast signal indicating a port to port passing. At that precise moment the HESS DIESEL gave the first of two blasts which, if heard and coupled with the second blast, indicated a starboard to starboard passing. For those aboard the M. L. GOSNEY the noise created by her one blast made it impossible to hear the first of the two blasts from the HESS DIESEL. Thus, those aboard the M. L. GOSNEY heard only one blast from the HESS DIESEL,

and those aboard the latter vessel heard nothing from the M. L. GOSNEY. The M. L. GOSNEY, assuming that the second blast from the HESS DIESEL was an answer to her signal, continued in contemplation of a port to port passage. The HESS DIESEL, acting under the assumption that the other vessel had heard the starboard to starboard passing signal, commenced a turn to her left from her previous position favoring the port side of the channel. As the vessels approached each other the HESS DIESEL gave another two blast signal which was immediately followed by a four blast signal from the M. L. GOSNEY. It is significant to note that the HESS DIESEL did not await any assent from the M. L. GOSNEY to the first suggested starboard to starboard passing before veering further to port.

At the time of the initial signal the M. L. GOSNEY had started, and continued to make, a right turn to her starboard to accomplish the contemplated port to port passing and also to navigate the bend in the river commencing at Buoy #29.

The collision took place on the extreme eastern side of the channel between Buoys #29 and #27, somewhat nearer to Bouy #27. The eastern side of the channel was, as noted, the M. L. GOSNEY's starboard side and the HESS DIESEL's port side. The starboard bow of the M. L. GOSNEY struck the starboard side of the HESS DIESEL at an approximate 45° angle near amidships. The time of collision was 0556 hours.

Three principal issues are necessary to determine. The HESS DIESEL argues vigorously that the M. L. GOSNEY did not show her navigation lights until just prior to the collision and, before that time, the lights were not burning. Such a failure, if in fact it existed, would be a statutory fault, thereby placing the burden upon the M. L. GOSNEY to show that such fault could not have, with reasonable possibility, contributed to the collision.

Reviewing the testimony of the four witnesses aboard the HESS DIESEL who may tend to support the claim of statutory fault with respect to lights as to the M. L. GOSNEY, the chief mate, Goolsbe, stated that the lights on the approaching vessel "came on suddenly" when the M. L. GOSNEY was 2½ to 3 ship lengths away, and that prior to that time there were no lights in the channel indicating any approaching vessel. The bow lookout on the HESS DIESEL likewise asserted that the lights appeared suddenly and that the coal piers did not block his view although he could not swear to it. The master, Brandstrom, also said that the lights of the M. L. GOSNEY "came on all of a sudden." The pilot, Hudgins, testified that when he was abeam of Buoy #27, he could see at least two miles down the river; he claims to have seen the light on the construction buoy, a considerable distance inbound of Buoy #29, but did not see any large vessels in the channel; he further stated that the lights on the M. L. GOSNEY suddenly came on and, in his opinion, were not on prior to that time.

Testimony from witnesses produced by the M. L. GOSNEY tends to disprove the foregoing and, in addition, supports the contention that the lights had been on since the vessel left the Sinclair terminal at Portsmouth. The master stated that he checked the navigation lights before leaving the dock and they were burning. The vessel was equipped with a warning device which flashes a red light and a buzzer sounds on a switchboard in the wheelhouse whenever one of the navigation lights burns out. The captain said that no such warning signal was seen or heard prior to the collision. Moreover, he claims, when proceeding at night there is a reflection of the range lights on the two white kingposts and if the lights are out, the absence of such reflection would be apparent. The second mate, Graves, stated that he checked the running lights on the M. L. GOSNEY at 0400 hours on the morning of February 9, 1961, and they were in per-

fect condition. Heath, the pilot on the M. L. GOSNEY, testified that the absence of lights on the vessel would have been apparent to him as, in such a situation, he would not have seen the reflection from the lights on the two bridges when he passed under them. He affirmatively asserts that he did notice the reflection from the lights. The first engineer testified that there was no power failure on the M. L. GOSNEY from the time she left the dock until the moment of collision.

Callis, the compulsory pilot on the M/V NUMERIAN—the vessel overtaken by the HESS DIESEL—testified that he saw the M. L. GOSNEY when the latter was approximately one ship's length from Buoy #29 at which time her navigation lights were burning although on cross-examination he stated that he was in excess of a mile away from the point of collision. Rindge, the captain of the tug ALEXANDER McALLISTER, had drawn ahead of the M. L. GOSNEY a few minutes prior to the collision; when he passed the tanker, he noticed nothing unusual about her lights and, in his opinion, he would have observed the absence of any navigation lights; as Rindge explained his statement, he noted that navigation lights are like a street light—"when it's out you notice it, and when it isn't you don't notice it."

The strong preponderance of the evidence supports the argument of the M. L. GOSNEY. Moreover, it was necessary for this vessel to go through or under two draw bridges prior to reaching the point of collision. It is the finding of this court that the proper navigation lights were burning at all pertinent times prior to the impact. In addition, there is a rebuttable presumption that the lights, if found to be burning when the vessel left the Sinclair dock, continued to burn. The R. B. M. Burke-The Cooper's Point, D.C.E.D.Pa., 294 F. 987. This principle of law was approved in G. W. Sheldon & Co. v. Hamburg Amer. P-A-G., 3 Cir., 28 F.2d 249, 252, where the court said: "In certain cases, there is a presumption of the continuance of a state or condition once in existence until the object or purpose of the state or condition is completed". The Third Circuit thereafter cites The R. B. M. Burke, supra. We think it probable that the mid-channel position of the HESS DIESEL, combined with the intervening Lamberts Point Coal Piers and the bend in the river, effectively precluded the possibility of seeing the lights on the M. L. GOSNEY until it was too late. As the bow lookout on the HESS DIESEL so aptly described the situation, "When I saw the ship it came by just like it had come from around a corner or something." And for what it may be worth, it is somewhat significant that the captain of the HESS DIESEL made no reference in his log as to the sudden appearance of the lights from the approaching vessel.

The second issue relates to the position in the channel of the respective vessels and whether the same was a contributing factor to the collision. Manifestly the HESS DIESEL violated the narrow channel rule. Art. 25, 33 U.S. C.A. § 210. Furthermore, the proposed starboard to starboard passing, even if audible, implies an assent by the approaching vessel. Art. 18, Rule 1, 33 U.S.C.A. § 203; Harbor Towing Corporation v. Tug Reliance, D.C.E.D.Va., 211 F.Supp. 896. The vessel initiating the starboard to starboard passing assumes the risk of the inability of the vessels to pass in that manner. Belden v. Chase, 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218. One departing from the narrow channel rule without assent from the approaching vessel has a heavy burden. The Victory and The Plymothian, 168 U.S. 410, 18 S. Ct. 149, 42 L.Ed. 519. While it is true that the degaussing range presented an obstacle which witnesses testified that inbound vessels attempt to avoid by moving to mid-channel, it was not such a hazard as necessitated a starboard to starboard passing. Several disinterested navigators stated that they had never seen a

starboard to starboard passing attempted at Lamberts Point Coal Piers.

■ There is a conflict as to the actual position of the two vessels as they approached the Lamberts Point Coal Piers and just prior to the collision. The chief mate on the HESS DEISEL places the vessel between 300–350 feet from Buoy #27 when abeam of same, and it was at this time that the pilot ordered an easy left on the rudder. At the Coast Guard hearing the same chief mate estimated this distance to be 250 feet. He also places the M. L. GOSNEY on her lefthand side of the channel when he first saw this vessel. The bow lookout on the HESS DIESEL approximates the first observed position of the M. L. GOSNEY at ½° to 1° off the starboard bow of the HESS DIESEL, at which time the HESS DIESEL was mid-channel; the bow lookout gives the impression that there existed a crossing situation with the M. L. GOSNEY crossing over the bow of the HESS DIESEL. The master of the HESS DIESEL places the green side light from the M. L. GOSNEY directly ahead of the HESS DIESEL, with the masthead of the approaching vessel approximately 8° to 10° on the HESS DIESEL's starboard bow. The pilot referred to the M. L. GOSNEY as being dead ahead with her range lights wide open and her green side light visible; on this assumption he concluded that a port to port passage would be impracticable.

Those testifying for the M. L. GOSNEY indicate a contrary opinion as to the relative positions of the vessels. When the M. L. GOSNEY passed the construction buoy at the tunnel site, the buoy was to her port according to her master. He further indicates that the vessel was close to Buoy #29 when he passed it. The second mate placed the HESS DIESEL on her port hand of the channel when he first observed it and, at the bend of the river, the M. L. GOSNEY was on its starboard side of the channel. The testimony of the compulsory pilot on the M/V NUMERIAN has been heretofore mentioned; he refers to the lights on the two vessels as merging on the eastern side of the channel. Rindge, the captain of the tug which overtook the M. L. GOSNEY, said that when the vessels first exchanged signals, they were in position for a port to port passage, but at the moment of the HESS DIESEL's second two blast signal the vessels could not have effected a starboard to starboard passage. At this last mentioned time it is likewise improbable that the vessels could have negotiated a port to port passing with any reasonable degree of safety.

Libelant relies heavily upon the course recorder aboard the M. L. GOSNEY to prove that this vessel was not in proper channel position. The course from the construction buoy to Buoy #29 is 311° whereas the course recorder reflects the vessel's course to be 308½°—a course which, if true, would place the M. L. GOSNEY on her port side of the channel when abeam of Buoy #29. The course recorder graph also indicates a turn of 37½° approaching Lamberts Point Coal Piers which, if completed, would have placed the M. L. GOSNEY on the piers.

A marine survey engineer for Sperry Gyroscope Company tested the course recorder about eight months after the collision and a 3° error was discovered in manually moving from quadrant to quadrant. The vessel had changed quadrants when backing out of the Sinclair terminal and this movement could have created a 2° to 3° error in the course recorder.

The wind was on the M. L. GOSNEY's port bow which could bring about a 1° error in the graph, since the vessel would be required to steer slightly more to port to keep on course. As to the turn in the bend of the river, this would normally be 21° thus indicating that the vessel was only 16½° from channel course.

■ We fully recognize the evidentiary importance of a course recorder

**6**

graph. It is not, however, an infallible instrument. When considered in light of the testimony of the disinterested witnesses Rindge and Callis, who place the M. L. GOSNEY on her right hand side of the channel, we believe it to be a reasonable inference to conclude that the course recorder did not reflect the true course.

■ The final point is the alleged failure of the M. L. GOSNEY to maintain a proper bow lookout. Libelant urges that the lookout failed to report the approach of the HESS DIESEL. Respondent argues that the primary duty of a lookout on a clear dark night is to observe and report vessels and small craft in close proximity, and that a tanker such as the HESS DIESEL could more readily be observed from an elevated position on the bridge. We think that this issue is essentially governed by Osaka Shosen Kaisha, Ltd. v. Angelos, Leitch & Co., Ltd., 4 Cir., 301 F.2d 59, where it was said: "All that was fairly observable, they observed. A crewman solely devoted to lookout could not have accomplished more." When attempting to define the duties of a bow lookout, it is sufficient to state that his failure to report must be a contributory factor in the collision. Cf. Esso Standard Oil Co. v. Oil Screw Tug Maluco, D.C.E.D. Va., 212 F.Supp. 449. We hold that any failure of the bow lookout to report could not have, with reasonable possibility, contributed to the collision.

Holding that the sole proximate cause of the collision was the fault of the HESS DIESEL, and adopting this memorandum in lieu of specific findings of fact and conclusions of law in accordance with Admiralty Rule 46½, proctors for the respondents and cross-libelants will prepare and present, after affording an opportunity for inspection and endorsement, an appropriate interlocutory decree. If the parties are unable to agree upon the extent of damage within sixty (60) days from this date, the matter will be referred for determination of same.